(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SESSIONS, ATTORNEY GENERAL *v.* MORALES-SANTANA

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 15–1191.   Argued November 9, 2016—Decided June 12, 2017

The Immigration and Nationality Act provides the framework for ac-
quisition of U. S. citizenship from birth by a child born abroad, when
one parent is a U. S. citizen and the other a citizen of another nation.
Applicable to married couples, the main rule in effect at the time here
relevant, 8 U. S. C. §1401(a)(7) (1958 ed.), required the U. S.-citizen
parent to have ten years' physical presence in the United States prior
to the child's birth, "at least five of which were after attaining" age
14.   The rule is made applicable to unwed U. S.-citizen fathers by
§1409(a), but §1409(c) creates an exception for an unwed U. S.-citizen
mother, whose citizenship can be transmitted to a child born abroad
if she has lived continuously in the United States for just one year
prior to the child's birth.

  Respondent Luis Ramón Morales-Santana, who has lived in the
United States since he was 13, asserts U. S. citizenship at birth
based on the U. S. citizenship of his biological father, José Morales.
José moved to the Dominican Republic 20 days short of his 19th
birthday, therefore failing to satisfy §1401(a)(7)'s requirement of five
years' physical presence after age 14.   There, he lived with the Do-
minican woman who gave birth to Morales-Santana.   José accepted
parental responsibility and included Morales-Santana in his house-
hold; he married Morales-Santana's mother and his name was then
added to hers on Morales-Santana's birth certificate.   In 2000, the
Government sought to remove Morales-Santana based on several
criminal convictions, ranking him as alien because, at his time of
birth, his father did not satisfy the requirement of five years' physical
presence after age 14.   An immigration judge rejected Morales-
Santana's citizenship claim and ordered his removal.   Morales-

Santana later moved to reopen the proceedings, asserting that the Government's refusal to recognize that he derived citizenship from his U. S.-citizen father violated the Constitution's equal protection guarantee. The Board of Immigration Appeals denied the motion, but the Second Circuit reversed. Relying on this Court's post-1970 construction of the equal protection principle as it bears on gender-based classifications, the court held unconstitutional the differential treatment of unwed mothers and fathers. To cure this infirmity, the Court of Appeals held that Morales-Santana derived citizenship through his father, just as he would were his mother the U. S. citizen.

*Held*:

  1. The gender line Congress drew is incompatible with the Fifth Amendment's requirement that the Government accord to all persons "the equal protection of the laws." Pp. 6–23.

    (a) Morales-Santana satisfies the requirements for third-party standing in seeking to vindicate his father's right to equal protection. José Morales' ability to pass citizenship to his son easily satisfies the requirement that the third party have a "'close' relationship with the person who possesses the right." *Kowalski* v. *Tesmer*, 543 U. S. 125, 130. And José's death many years before the current controversy arose is "a 'hindrance' to [José's] ability to protect his own interests." *Ibid.* Pp. 6–7.

    (b) Sections 1401 and 1409 date from an era when the Nation's lawbooks were rife with overbroad generalizations about the way men and women are. Today, such laws receive the heightened scrutiny that now attends "all gender-based classifications," *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 136, including laws granting or denying benefits "on the basis of the sex of the qualifying parent," *Califano* v. *Westcott*, 443 U. S. 76, 84. Prescribing one rule for mothers, another for fathers, §1409 is of the same genre as the classifications declared unconstitutional in *Westcott*; *Reed* v. *Reed*, 404 U. S. 71, 74, 76–77; *Frontiero* v. *Richardson*, 411 U. S. 677, 688–691; *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 648–653; and *Califano* v. *Goldfarb*, 430 U. S. 199, 206–207. A successful defense therefore requires an "'exceedingly persuasive justification.'" *United States* v. *Virginia*, 518 U. S. 515, 531. Pp. 7–9.

    (c) The Government must show, at least, that its gender-based "'classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to [achieving] those objectives."'" *Virginia*, 518 U. S., at 533. The classification must serve an important governmental interest *today*, for "new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Obergefell* v. *Hodges*, 576 U. S. ___, ___. Pp. 9–14.

Syllabus

(1) At the time §1409 was enacted as part of the Nationality Act of 1940 (1940 Act), two once habitual, but now untenable, assumptions pervaded the Nation's citizenship laws and underpinned judicial and administrative rulings: In marriage, husband is dominant, wife subordinate; unwed mother is the sole guardian of a non-marital child. In the 1940 Act, Congress codified the mother-as-sole-guardian perception for unmarried parents. According to the stereotype, a residency requirement was justified for unwed citizen fathers, who would care little about, and have scant contact with, their non-marital children. Unwed citizen mothers needed no such prophylactic, because the alien father, along with his foreign ways, was presumptively out of the picture. Pp. 9–13.

(2) For close to a half century, this Court has viewed with suspicion laws that rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U. S., at 533. No "important [governmental] interest" is served by laws grounded, as §1409(a) and (c) are, in the obsolescing view that "unwed fathers [are] invariably less qualified and entitled than mothers" to take responsibility for nonmarital children. *Caban* v. *Mohammed*, 441 U. S. 380, 382, 394. In light of this equal protection jurisprudence, §1409(a) and (c)'s discrete duration-of-residence requirements for mothers and fathers are anachronistic. Pp. 13–14.

(d) The Government points to *Fiallo* v. *Bell*, 430 U. S. 787; *Miller* v. *Albright*, 523 U. S. 420; and *Nguyen* v. *INS*, 533 U. S. 53, for support. But *Fiallo* involved entry preferences for alien children; the case did not present a claim of U. S. citizenship. And *Miller* and *Nguyen* addressed a paternal-acknowledgment requirement well met here, not the length of a parent's prebirth residency in the United States. Pp. 14–16.

(e) The Government's suggested rationales for §1409(a) and (c)'s gender-based differential do not survive heightened scrutiny. Pp. 16–23.

(1) The Government asserts that Congress sought to ensure that a child born abroad has a strong connection to the United States. The statute, the Government suggests, bracketed an unwed U. S.-citizen mother with a married couple in which both parents are U. S. citizens because she is the only legally recognized parent at birth; and aligned an unwed U. S.-citizen father with a married couple, one spouse a citizen, the other, an alien, because of the competing national influence of the alien mother. This rationale conforms to the long-held view that unwed fathers care little about their children. And the gender-based means scarcely serve the suggested congressional interest. Citizenship may be transmitted to children who have no tie to the United States so long as their U. S.-citizen mother was

continuously present in the United States for one year at any point in her life *prior* to the child's birth; but it may not be transmitted by a U. S.-citizen father who falls a few days short of meeting §1401(a)(7)'s longer physical-presence requirements, even if he acknowledges paternity on the day the child is born and raises the child in the United States. Pp. 17–19.

(2) The Government also maintains that Congress wished to reduce the risk of statelessness for the foreign-born child of a U. S. citizen. But congressional hearings and reports offer no support for the assertion that a statelessness concern prompted the diverse physical-presence requirements. Nor has the Government shown that the risk of statelessness disproportionately endangered the children of unwed U. S.-citizen mothers. Pp. 19–23.

2. Because this Court is not equipped to convert §1409(c)'s exception for unwed U. S.-citizen mothers into the main rule displacing §§1401(a)(7) and 1409(a), it falls to Congress to select a uniform prescription that neither favors nor disadvantages any person on the basis of gender. In the interim, §1401(a)(7)'s current requirement should apply, prospectively, to children born to unwed U. S.-citizen mothers. The legislature's intent, as revealed by the statute at hand, governs the choice between the two remedial alternatives: extending favorable treatment to the excluded class or withdrawing favorable treatment from the favored class. Ordinarily, the preferred rule is to extend favorable treatment. *Westcott*, 443 U. S., at 89–90. Here, however, extension to fathers of §1409(c)'s favorable treatment for mothers would displace Congress' general rule, the longer physical-presence requirements of §§1401(a)(7) and 1409 applicable to unwed U. S.-citizen fathers and U. S.-citizen parents, male as well as female, married to the child's alien parent. Congress' " 'commitment to th[is] residual policy' " and " 'the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation,' " *Heckler* v. *Mathews*, 465 U. S. 728, 739, n. 5, indicate that Congress would likely have abrogated §1409(c)'s special exception, preferring to preserve "the importance of residence in this country as the talisman of dedicated attachment," *Rogers* v. *Bellei*, 401 U. S. 815, 834. Pp. 23–28.

804 F. 3d 520, affirmed in part, reversed in part, and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment in part, in which ALITO, J., joined. GORSUCH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 15–1191

---

## JEFFERSON B. SESSIONS, III, ATTORNEY GENERAL, PETITIONER *v.* LUIS RAMON MORALES-SANTANA

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 12, 2017]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns a gender-based differential in the law governing acquisition of U. S. citizenship by a child born abroad, when one parent is a U. S. citizen, the other, a citizen of another nation. The main rule appears in 8 U. S. C. §1401(a)(7) (1958 ed.), now §1401(g) (2012 ed.). Applicable to married couples, §1401(a)(7) requires a period of physical presence in the United States for the U. S.-citizen parent. The requirement, as initially prescribed, was ten years' physical presence prior to the child's birth, §601(g) (1940 ed.); currently, the requirement is five years prebirth, §1401(g) (2012 ed.). That main rule is rendered applicable to unwed U. S.-citizen fathers by §1409(a). Congress ordered an exception, however, for unwed U. S.-citizen mothers. Contained in §1409(c), the exception allows an unwed mother to transmit her citizenship to a child born abroad if she has lived in the United States for just one year prior to the child's birth.

The respondent in this case, Luis Ramón Morales-Santana, was born in the Dominican Republic when his father was just 20 days short of meeting §1401(a)(7)'s

physical-presence requirement. Opposing removal to the Dominican Republic, Morales-Santana asserts that the equal protection principle implicit in the Fifth Amendment[1] entitles him to citizenship stature. We hold that the gender line Congress drew is incompatible with the requirement that the Government accord to all persons "the equal protection of the laws." Nevertheless, we cannot convert §1409(c)'s exception for unwed mothers into the main rule displacing §1401(a)(7) (covering married couples) and §1409(a) (covering unwed fathers). We must therefore leave it to Congress to select, going forward, a physical-presence requirement (ten years, one year, or some other period) uniformly applicable to all children born abroad with one U. S.-citizen and one alien parent, wed or unwed. In the interim, the Government must ensure that the laws in question are administered in a manner free from gender-based discrimination.

## I
### A

We first describe in greater detail the regime Congress constructed. The general rules for acquiring U. S. citizenship are found in 8 U. S. C. §1401, the first section in Chapter 1 of Title III of the Immigration and Nationality Act (1952 Act or INA), §301, 66 Stat. 235–236. Section 1401 sets forth the INA's rules for determining who "shall be nationals and citizens of the United States at birth" by

—————

[1] As this case involves federal, not state, legislation, the applicable equality guarantee is not the Fourteenth Amendment's explicit Equal Protection Clause, it is the guarantee implicit in the Fifth Amendment's Due Process Clause. See *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 638, n. 2 (1975) ("[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." (citations and internal quotation marks omitted; alteration in original)).

establishing a range of residency and physical-presence requirements calibrated primarily to the parents' nationality and the child's place of birth. §1401(a) (1958 ed.); §1401 (2012 ed.). The primacy of §1401 in the statutory scheme is evident. Comprehensive in coverage, §1401 provides the general framework for the acquisition of citizenship at birth. In particular, at the time relevant here,[2] §1401(a)(7) provided for the U. S. citizenship of

> "a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years: *Provided*, That any periods of honorable service in the Armed Forces of the United States by such citizen parent may be included in computing the physical presence requirements of this paragraph."

Congress has since reduced the duration requirement to five years, two after age 14. §1401(g) (2012 ed.).[3]

Section 1409 pertains specifically to children with unmarried parents. Its first subsection, §1409(a), incorporates by reference the physical-presence requirements of §1401, thereby allowing an acknowledged unwed citizen parent to transmit U. S. citizenship to a foreign-born child

_____

[2] Unless otherwise noted, references to 8 U. S. C. §§1401 and 1409 are to the 1958 edition of the U. S. Code, the version in effect when respondent Morales-Santana was born. Section 1409(a) and (c) have retained their numbering; §1401(a)(7) has become §1401(g).

[3] The reduction affects only children born on or after November 14, 1986. §8(r), 102 Stat. 2619; see §§12–13, 100 Stat. 3657. Because Morales-Santana was born in 1962, his challenge is to the ten-years, five-after-age-14 requirement applicable at the time of his birth.

under the same terms as a married citizen parent. Section
1409(c)—a provision applicable only to unwed U. S.-citizen
mothers—states an exception to the physical-presence
requirements of §§1401 and 1409(a). Under §1409(c)'s
exception, only one year of continuous physical presence is
required before unwed mothers may pass citizenship to
their children born abroad.

## B

Respondent Luis Ramón Morales-Santana moved to the
United States at age 13, and has resided in this country
most of his life. Now facing deportation, he asserts U. S.
citizenship at birth based on the citizenship of his biologi-
cal father, José Morales, who accepted parental responsi-
bility and included Morales-Santana in his household.

José Morales was born in Guánica, Puerto Rico, on
March 19, 1900. Record 55–56. Puerto Rico was then, as
it is now, part of the United States, see *Puerto Rico* v.
*Sanchez Valle*, 579 U. S. ___, ___–___ (2016) (slip op., at 2–
4); 8 U. S. C. §1101(a)(38) (1958 ed.) ("The term United
States . . . means the continental United States, Alaska,
Hawaii, Puerto Rico, Guam, and the [U. S.] Virgin Is-
lands." (internal quotation marks omitted)); §1101(a)(38)
(2012 ed.) (similar), and José became a U. S. citizen under
the Organic Act of Puerto Rico, ch. 145, §5, 39 Stat. 953 (a
predecessor to 8 U. S. C. §1402). After living in Puerto
Rico for nearly two decades, José left his childhood home
on February 27, 1919, 20 days short of his 19th birthday,
therefore failing to satisfy §1401(a)(7)'s requirement of five
years' physical presence after age 14. Record 57, 66. He
did so to take up employment as a builder-mechanic for a
U. S. company in the then-U. S.-occupied Dominican
Republic. *Ibid.*[4]

―――――――――

[4] See generally B. Calder, The Impact of Intervention: The Dominican
Republic During the U. S. Occupation of 1916–1924, pp. 17, 204–205
(1984) (describing establishment of a U. S. military government in the

By 1959, José attested in a June 21, 1971 affidavit presented to the U. S. Embassy in the Dominican Republic, he was living with Yrma Santana Montilla, a Dominican woman he would eventually marry. *Id.*, at 57. In 1962, Yrma gave birth to their child, respondent Luis Morales-Santana. *Id.*, at 166–167. While the record before us reveals little about Morales-Santana's childhood, the Dominican archives disclose that Yrma and José married in 1970, and that José was then added to Morales-Santana's birth certificate as his father. *Id.*, at 163–164, 167. José also related in the same affidavit that he was then saving money "for the susten[ance] of [his] family" in anticipation of undergoing surgery in Puerto Rico, where members of his family still resided. *Id.*, at 57. In 1975, when Morales-Santana was 13, he moved to Puerto Rico, *id.*, at 368, and by 1976, the year his father died, he was attending public school in the Bronx, a New York City borough, *id.*, at 140, 369.[5]

## C

In 2000, the Government placed Morales-Santana in removal proceedings based on several convictions for offenses under New York State Penal Law, all of them rendered on May 17, 1995. *Id.*, at 426. Morales-Santana ranked as an alien despite the many years he lived in the United States, because, at the time of his birth, his father did not satisfy the requirement of five years' physical presence after age 14. See *supra*, at 3–4, and n. 3. An immigration judge rejected Morales-Santana's claim to citizenship derived from the U. S. citizenship of his father, and ordered Morales-Santana's removal to the Dominican

---

Dominican Republic in 1916, and plans, beginning in late 1920, for withdrawal).

[5]There is no question that Morales-Santana himself satisfied the five-year residence requirement that once conditioned a child's acquisition of citizenship under §1401(a)(7). See §1401(b).

Republic. Record 253, 366; App. to Pet. for Cert. 45a–49a. In 2010, Morales-Santana moved to reopen the proceedings, asserting that the Government's refusal to recognize that he derived citizenship from his U. S.-citizen father violated the Constitution's equal protection guarantee. See Record 27, 45. The Board of Immigration Appeals (BIA) denied the motion. App. to Pet. for Cert. 8a, 42a–44a.

The United States Court of Appeals for the Second Circuit reversed the BIA's decision. 804 F. 3d 520, 524 (2015). Relying on this Court's post-1970 construction of the equal protection principle as it bears on gender-based classifications, the court held unconstitutional the differential treatment of unwed mothers and fathers. *Id.*, at 527–535. To cure the constitutional flaw, the court further held that Morales-Santana derived citizenship through his father, just as he would were his mother the U. S. citizen. *Id.*, at 535–538. In so ruling, the Second Circuit declined to follow the conflicting decision of the Ninth Circuit in *United States* v. *Flores-Villar*, 536 F. 3d 990 (2008), see 804 F. 3d, at 530, 535, n. 17. We granted certiorari in *Flores-Villar*, but ultimately affirmed by an equally divided Court. *Flores-Villar* v. *United States*, 564 U. S. 210 (2011) (*per curiam*). Taking up Morales-Santana's request for review, 579 U. S. ___ (2016), we consider the matter anew.

II

Because §1409 treats sons and daughters alike, Morales-Santana does not suffer discrimination on the basis of *his* gender. He complains, instead, of gender-based discrimination against his father, who was unwed at the time of Morales-Santana's birth and was not accorded the right an unwed U. S.-citizen mother would have to transmit citizenship to her child. Although the Government does not contend otherwise, we briefly explain why Morales-

Santana may seek to vindicate his father's right to the equal protection of the laws.[6]

Ordinarily, a party "must assert his own legal rights" and "cannot rest his claim to relief on the legal rights . . . of third parties." *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975). But we recognize an exception where, as here, "the party asserting the right has a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Kowalski* v. *Tesmer*, 543 U. S. 125, 130 (2004) (quoting *Powers* v. *Ohio*, 499 U. S. 400, 411 (1991)). José Morales' ability to pass citizenship to his son, respondent Morales-Santana, easily satisfies the "close relationship" requirement. So, too, is the "hindrance" requirement well met. José Morales' failure to assert a claim in his own right "stems from disability," not "disinterest," *Miller* v. *Albright*, 523 U. S. 420, 450 (1998) (O'Connor, J., concurring in judgment), for José died in 1976, Record 140, many years before the current controversy arose. See *Hodel* v. *Irving*, 481 U. S. 704, 711–712, 723, n. 7 (1987) (children and their guardians may assert Fifth Amendment rights of deceased relatives). Morales-Santana is thus the "obvious claimant," see *Craig* v. *Boren*, 429 U. S. 190, 197 (1976), the "best available proponent," *Singleton* v. *Wulff*, 428 U. S. 106, 116 (1976), of his father's right to equal protection.

## III

Sections 1401 and 1409, we note, date from an era when the lawbooks of our Nation were rife with overbroad generalizations about the way men and women are. See, *e.g.*, *Hoyt* v. *Florida*, 368 U. S. 57, 62 (1961) (women are the

—————

[6]We explain why Morales-Santana has third-party standing in view of the Government's opposition to such standing in *Flores-Villar* v. *United States*, 564 U. S. 210 (2011) (*per curiam*). See Brief for United States, O. T. 2010, No. 09–5801, pp. 10–14.

"center of home and family life," therefore they can be "relieved from the civic duty of jury service"); *Goesaert* v. *Cleary*, 335 U. S. 464, 466 (1948) (States may draw "a sharp line between the sexes"). Today, laws of this kind are subject to review under the heightened scrutiny that now attends "all gender-based classifications." *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 136 (1994); see, *e.g.*, *United States* v. *Virginia*, 518 U. S. 515, 555–556 (1996) (state-maintained military academy may not deny admission to qualified women).

Laws granting or denying benefits "on the basis of the sex of the qualifying parent," our post-1970 decisions affirm, differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee. *Califano* v. *Westcott*, 443 U. S. 76, 84 (1979); see *id.*, at 88–89 (holding unconstitutional provision of unemployed-parent benefits exclusively to fathers). Accord *Califano* v. *Goldfarb*, 430 U. S. 199, 206–207 (1977) (plurality opinion) (holding unconstitutional a Social Security classification that denied widowers survivors' benefits available to widows); *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 648–653 (1975) (holding unconstitutional a Social Security classification that excluded fathers from receipt of child-in-care benefits available to mothers); *Frontiero* v. *Richardson*, 411 U. S. 677, 688–691 (1973) (plurality opinion) (holding unconstitutional exclusion of married female officers in the military from benefits automatically accorded married male officers); cf. *Reed* v. *Reed*, 404 U. S. 71, 74, 76–77 (1971) (holding unconstitutional a probate-code preference for a father over a mother as administrator of a deceased child's estate).[7]

------

[7] See Gunther, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 34 (1972) ("It is difficult to understand [*Reed*] without an assumption that some special sensitivity to sex as a classifying factor entered into the analysis. . . . Only by importing some special suspicion of sex-related means

Prescribing one rule for mothers, another for fathers, §1409 is of the same genre as the classifications we declared unconstitutional in *Reed*, *Frontiero*, *Wiesenfeld*, *Goldfarb*, and *Westcott*. As in those cases, heightened scrutiny is in order. Successful defense of legislation that differentiates on the basis of gender, we have reiterated, requires an "exceedingly persuasive justification." *Virginia*, 518 U. S., at 531 (internal quotation marks omitted); *Kirchberg* v. *Feenstra*, 450 U. S. 455, 461 (1981) (internal quotation marks omitted).

## A

The defender of legislation that differentiates on the basis of gender must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U. S., at 533 (quoting *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 724 (1982); alteration in original); see *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 60, 70 (2001). Moreover, the classification must substantially serve an important governmental interest *today*, for "in interpreting the [e]qual [p]rotection [guarantee], [we have] recognized that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Obergefell* v. *Hodges*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 20). Here, the Government has supplied no "exceedingly persuasive justification," *Virginia*, 518 U. S., at 531 (internal quotation marks omitted), for §1409(a) and (c)'s "gender-based" and "gender-biased" disparity, *Westcott*, 443 U. S., at 84 (internal quotation marks omitted).

### 1

History reveals what lurks behind §1409. Enacted in

――――――

. . . can the [*Reed*] result be made entirely persuasive.").

the Nationality Act of 1940 (1940 Act), see 54 Stat. 1139–
1140, §1409 ended a century and a half of congressional
silence on the citizenship of children born abroad to unwed
parents.[8]   During this era, two once habitual, but now
untenable, assumptions pervaded our Nation's citizenship
laws and underpinned judicial and administrative rulings:
In marriage, husband is dominant, wife subordinate;
unwed mother is the natural and sole guardian of a non-
marital child.

Under the once entrenched principle of male dominance
in marriage, the husband controlled both wife and child.
"[D]ominance [of] the husband," this Court observed in
1915, "is an ancient principle of our jurisprudence." *Mac-
kenzie* v. *Hare*, 239 U. S. 299, 311 (1915).[9]  See generally
Brief for Professors of History et al. as *Amici Curiae* 4–15.
Through the early 20th century, a male citizen automati-
cally conferred U. S. citizenship on his alien wife.  Act of
Feb. 10, 1855, ch. 71, §2, 10 Stat. 604; see *Kelly* v. *Owen*, 7
Wall. 496, 498 (1869) (the 1855 Act "confers the privileges
of citizenship upon women married to citizens of the United
States"); C. Bredbenner, A Nationality of Her Own:
Women, Marriage, and the Law of Citizenship 15–16, 20–21
(1998).  A female citizen, however, was incapable of con-
ferring citizenship on her husband; indeed, she was sub-
ject to expatriation if she married an alien.[10]  The family of

---

[8] The provision was first codified in 1940 at 8 U. S. C. §605, see §205,
54 Stat. 1139–1140, and recodified in 1952 at §1409, see §309, 66 Stat.
238–239.  For simplicity, we here use the latter designation.

[9] This "ancient principle" no longer guides the Court's jurisprudence.
See *Kirchberg* v. *Feenstra*, 450 U. S. 455, 456 (1981) (invalidating, on
equal protection inspection, Louisiana's former "head and master"
rule).

[10] See generally C. Bredbenner, A Nationality of Her Own: Women,
Marriage, and the Law of Citizenship 58–61 (1998); Sapiro, Women,
Citizenship, and Nationality: Immigration and Naturalization Policies
in the United States, 13 Politics & Society 1, 4–10 (1984).  In 1907,
Congress codified several judicial decisions and prevailing State De-

a citizen or a lawfully admitted permanent resident enjoyed statutory exemptions from entry requirements, but only if the citizen or resident was male. See, *e.g.*, Act of Mar. 3, 1903, ch. 1012, §37, 32 Stat. 1221 (wives and children entering the country to join permanent-resident aliens and found to have contracted contagious diseases during transit shall not be deported if the diseases were easily curable or did not present a danger to others); S. Rep. No. 1515, 81st Cong., 2d Sess., 415–417 (1950) (wives exempt from literacy and quota requirements). And from 1790 until 1934, the foreign-born child of a married couple gained U. S. citizenship only through the father.[11]

For unwed parents, the father-controls tradition never held sway. Instead, the mother was regarded as the child's natural and sole guardian. At common law, the mother, and only the mother, was "bound to maintain [a nonmarital child] as its natural guardian." 2 J. Kent, Commentaries on American Law *215–*216 (8th ed. 1854); see *Nguyen*, 533 U. S., at 91–92 (O'Connor, J., dissenting). In line with that understanding, in the early 20th century, the State Department sometimes permitted

_____

partment views by providing that a female U. S. citizen automatically lost her citizenship upon marriage to an alien. Act of Mar. 2, 1907, ch. 2534, §3, 34 Stat. 1228; see L. Gettys, The Law of Citizenship in the United States 119 (1934). This Court upheld the statute. *Mackenzie* v. *Hare*, 239 U. S. 299, 311 (1915).

[11]Act of Mar. 26, 1790, ch. 3, 1 Stat. 104; Act of Jan. 29, 1795, §3, 1 Stat. 415; Act of Apr. 14, 1802, §4, 2 Stat. 155; Act of Feb. 10, 1855, ch. 71, §2, 10 Stat. 604; see 2 J. Kent, Commentaries on American Law *52–*53 (8th ed. 1854) (explaining that the 1802 Act, by adding "fathers," "seem[ed] to remove the doubt" about "whether the act intended by the words, 'children of persons,' both the father and mother, . . . or the father only"); Kerber, No Constitutional Right To Be Ladies: Women and the Obligations of Citizenship 36 (1998); Brief for Professors of History et al. as *Amici Curiae* 5–6. In 1934, Congress moved in a new direction by allowing a married mother to transmit her citizenship to her child. Act of May 24, 1934, ch. 344, §1, 48 Stat. 797.

unwed mothers to pass citizenship to their children, despite the absence of any statutory authority for the practice. See Hearings on H. R. 6127 before the House Committee on Immigration and Naturalization, 76th Cong., 1st Sess., 43, 431 (1940) (hereinafter 1940 Hearings); 39 Op. Atty. Gen. 397, 397–398 (1939); 39 Op. Atty. Gen. 290, 291 (1939). See also Collins, Illegitimate Borders: *Jus Sanguinis* Citizenship and the Legal Construction of Family, Race, and Nation, 123 Yale L. J. 2134, 2199–2205 (2014) (hereinafter Collins).

In the 1940 Act, Congress discarded the father-controls assumption concerning married parents, but codified the mother-as-sole-guardian perception regarding unmarried parents. The Roosevelt administration, which proposed §1409, explained: "[T]he mother [of a nonmarital child] stands in the place of the father . . . [,] has a right to the custody and control of such a child as against the putative father, and is bound to maintain it as its natural guardian." 1940 Hearings 431 (internal quotation marks omitted).

This unwed-mother-as-natural-guardian notion renders §1409's gender-based residency rules understandable. Fearing that a foreign-born child could turn out "more alien than American in character," the administration believed that a citizen parent with lengthy ties to the United States would counteract the influence of the alien parent. *Id.*, at 426–427. Concern about the attachment of foreign-born children to the United States explains the treatment of unwed citizen fathers, who, according to the familiar stereotype, would care little about, and have scant contact with, their nonmarital children. For unwed citizen mothers, however, there was no need for a prolonged residency prophylactic: The alien father, who might transmit foreign ways, was presumptively out of the picture. See *id.*, at 431; Collins 2203 (in "nearly uniform view" of U. S. officials, "almost invariably," the mother

alone "concern[ed] herself with [a nonmarital] child" (internal quotation marks omitted)).

2

For close to a half century, as earlier observed, see *supra*, at 7–8, this Court has viewed with suspicion laws that rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U. S., at 533; see *Wiesenfeld*, 420 U. S., at 643, 648. In particular, we have recognized that if a "statutory objective is to exclude or 'protect' members of one gender" in reliance on "fixed notions concerning [that gender's] roles and abilities," the "objective itself is illegitimate." *Mississippi Univ. for Women*, 458 U. S., at 725.

In accord with this eventual understanding, the Court has held that no "important [governmental] interest" is served by laws grounded, as §1409(a) and (c) are, in the obsolescing view that "unwed fathers [are] invariably less qualified and entitled than mothers" to take responsibility for nonmarital children. *Caban* v. *Mohammed*, 441 U. S. 380, 382, 394 (1979).[12] Overbroad generalizations of that order, the Court has come to comprehend, have a constraining impact, descriptive though they may be of the

—————

[12] *Lehr* v. *Robertson*, 463 U. S. 248 (1983), on which the Court relied in *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 62–64 (2001), recognized that laws treating fathers and mothers differently "may not constitutionally be applied . . . where the mother and father are in fact similarly situated with regard to their relationship with the child," *Lehr*, 463 U. S., at 267. The "similarly situated" condition was not satisfied in *Lehr*, however, for the father in that case had "never established any custodial, personal, or financial relationship" with the child. *Ibid.*

Here, there is no dispute that José Morales formally accepted parental responsibility for his son during Morales-Santana's childhood. See *supra*, at 5. If subject to the same physical-presence requirements that applied to unwed U. S.-citizen mothers, José would have been recognized as Morales-Santana's father "as of the date of birth." §1409(a); see §1409(c) ("at birth").

way many people still order their lives.[13]  Laws according
or denying benefits in reliance on "[s]tereotypes about
women's domestic roles," the Court has observed, may
"creat[e] a self-fulfilling cycle of discrimination that
force[s] women to continue to assume the role of primary
family caregiver."  *Nevada Dept. of Human Resources* v.
*Hibbs*, 538 U. S. 721, 736 (2003).  Correspondingly, such
laws may disserve men who exercise responsibility for
raising their children.  See *ibid.*  In light of the equal
protection jurisprudence this Court has developed since
1971, see *Virginia*, 518 U. S., at 531–534, §1409(a) and
(c)'s discrete duration-of-residence requirements for unwed
mothers and fathers who have accepted parental responsi-
bility is stunningly anachronistic.

### B

In urging this Court nevertheless to reject Morales-
Santana's equal protection plea, the Government cites
three decisions of this Court: *Fiallo* v. *Bell*, 430 U. S. 787
(1977); *Miller* v. *Albright*, 523 U. S. 420; and *Nguyen* v.
*INS*, 533 U. S. 53.  None controls this case.

The 1952 Act provision at issue in *Fiallo* gave special
immigration preferences to alien children of citizen (or

---

[13] Even if stereotypes frozen into legislation have "statistical
support," our decisions reject measures that classify unnecessarily and
overbroadly by gender when more accurate and impartial lines can be
drawn.  *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 139, n. 11
(1994); see, *e.g.*, *Craig* v. *Boren*, 429 U. S. 190, 198–199 (1976);
*Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 645 (1975).  In fact, unwed
fathers assume responsibility for their children in numbers already
large and notably increasing.  See Brief for Population and Family
Scholars as *Amici Curiae* 3, 5–13 (documenting that nonmarital fathers
"are [often] in a parental role at the time of their child's birth," and
"most . . . formally acknowledge their paternity either at the hospital or
in the birthing center just after the child is born"); Brief for American
Civil Liberties Union et al. as *Amici Curiae* 22 (observing, *inter alia*,
that "[i]n 2015, fathers made up 16 percent of single parents with
minor children in the United States").

lawful-permanent-resident) mothers, and to alien unwed mothers of citizen (or lawful-permanent-resident) children. 430 U. S., at 788–789, and n. 1. Unwed fathers and their children, asserting their right to equal protection, sought the same preferences. *Id.*, at 791. Applying minimal scrutiny (rational-basis review), the Court upheld the provision, relying on Congress' "exceptionally broad power" to admit or exclude aliens. *Id.*, at 792, 794.[14] This case, however, involves no entry preference for aliens. Morales-Santana claims he is, and since birth has been, a U. S. citizen. Examining a claim of that order, the Court has not disclaimed, as it did in *Fiallo*, the application of an exacting standard of review. See *Nguyen*, 533 U. S., at 60–61, 70; *Miller*, 523 U. S., at 434–435, n. 11 (opinion of Stevens, J.).

The provision challenged in *Miller* and *Nguyen* as violative of equal protection requires unwed U. S.-citizen fathers, but not mothers, to formally acknowledge parenthood of their foreign-born children in order to transmit their U. S. citizenship to those children. See §1409(a)(4) (2012 ed.).[15] After *Miller* produced no opinion

————————

[14] In 1986, nine years after the decision in *Fiallo*, Congress amended the governing law. The definition of "child" that included offspring of natural mothers but not fathers was altered to include children born out of wedlock who established a bona fide parent-child relationship with their natural fathers. See Immigration Reform and Control Act of 1986, §315(a), 100 Stat. 3439, as amended, 8 U. S. C. §1101(b)(1)(D) (1982 ed., Supp. IV); *Miller* v. *Albright*, 523 U. S. 420, 429, n. 4 (1998) (opinion of Stevens, J.).

[15] Section 1409(a), following amendments in 1986 and 1988, see §13, 100 Stat. 3657; §8(k), 102 Stat. 2618, now states:

"The provisions of paragraphs (c), (d), (e), and (g) of section 1401 of this title, . . . shall apply as of the date of birth to a person born out of wedlock if—

"(1) a blood relationship between the person and the father is established by clear and convincing evidence,

"(2) the father had the nationality of the United States at the time of the person's birth,

for the Court, see 523 U. S., at 423, we took up the issue anew in *Nguyen*. There, the Court held that imposing a paternal-acknowledgment requirement on fathers was a justifiable, easily met means of ensuring the existence of a biological parent-child relationship, which the mother establishes by giving birth. See 533 U. S., at 62–63. Morales-Santana's challenge does not renew the contest over §1409's paternal-acknowledgment requirement (whether the current version or that in effect in 1970), and the Government does not dispute that Morales-Santana's father, by marrying Morales-Santana's mother, satisfied that requirement.

Unlike the paternal-acknowledgment requirement at issue in *Nguyen* and *Miller*, the physical-presence re-quirements now before us relate solely to the duration of the parent's prebirth residency in the United States, not to the parent's filial tie to the child. As the Court of Ap-peals observed in this case, a man needs no more time in the United States than a woman "in order to have assimi-lated citizenship-related values to transmit to [his] child." 804 F. 3d, at 531. And unlike *Nguyen*'s parental-acknowledgment requirement, §1409(a)'s age-calibrated physical-presence requirements cannot fairly be described as "minimal." 533 U. S., at 70.

## C

Notwithstanding §1409(a) and (c)'s provenance in tradi-

———————

"(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and

"(4) while the person is under the age of 18 years—

"(A) the person is legitimated under the law of the person's residence or domicile,

"(B) the father acknowledges paternity of the person in writing under oath, or

"(C) the paternity of the person is established by adjudication of a competent court."

tional notions of the way women and men are, the Government maintains that the statute serves two important objectives: (1) ensuring a connection between the child to become a citizen and the United States and (2) preventing "statelessness," *i.e.*, a child's possession of no citizenship at all. Even indulging the assumption that Congress intended §1409 to serve these interests, but see *supra*, at 9–13, neither rationale survives heightened scrutiny.

1

We take up first the Government's assertion that §1409(a) and (c)'s gender-based differential ensures that a child born abroad has a connection to the United States of sufficient strength to warrant conferral of citizenship at birth. The Government does not contend, nor could it, that unmarried men take more time to absorb U. S. values than unmarried women do. See *supra*, at 16. Instead, it presents a novel argument, one it did not advance in *Flores-Villar*.[16]

An unwed mother, the Government urges, is the child's only "legally recognized" parent at the time of childbirth. Brief for Petitioner 9–10, 28–32.[17] An unwed citizen father enters the scene later, as a second parent. A longer physical connection to the United States is warranted for the unwed father, the Government maintains, because of the "competing national influence" of the alien mother. *Id.*, at 9–10. Congress, the Government suggests, designed the statute to bracket an unwed U. S.-citizen mother with a married couple in which both parents are U. S.

_____

[16] In *Flores-Villar*, the Government asserted only the risk-of-statelessness rationale, which it repeats here. See Brief for United States, O. T. 2010, No. 09–5801, at 22–39; *infra*, at 19–23.

[17] But see §1409(a) (unmarried U. S.-citizen father who satisfies the physical-presence requirements and, after his child is born, accepts parental responsibility transmits his citizenship to the child "as of the date of birth").

citizens,[18] and to align an unwed U. S.-citizen father with
a married couple, one spouse a citizen, the other, an alien.

Underlying this apparent design is the assumption that
the alien father of a nonmarital child born abroad to a
U. S.-citizen mother will not accept parental responsibil-
ity. For an actual affiliation between alien father and
nonmarital child would create the "competing national
influence" that, according to the Government, justifies
imposing on unwed U. S.-citizen fathers, but not unwed
U. S.-citizen mothers, lengthy physical-presence require-
ments. Hardly gender neutral, see *id.*, at 9, that assump-
tion conforms to the long-held view that unwed fathers
care little about, indeed are strangers to, their children.
See *supra*, at 9–13. Lump characterization of that kind,
however, no longer passes equal protection inspection.
See *supra*, at 13–14, and n. 13.

Accepting, *arguendo*, that Congress intended the diverse
physical-presence prescriptions to serve an interest in
ensuring a connection between the foreign-born nonmari-
tal child and the United States, the gender-based means
scarcely serve the posited end. The scheme permits the
transmission of citizenship to children who have no tie to
the United States so long as their mother was a U. S.
citizen continuously present in the United States for one
year at any point in her life *prior* to the child's birth. The
transmission holds even if the mother marries the child's
alien father immediately after the child's birth and never
returns with the child to the United States. At the same
time, the legislation precludes citizenship transmission by
a U. S.-citizen father who falls a few days short of meeting
§1401(a)(7)'s longer physical-presence requirements, even

––––––––––

[18] When a child is born abroad to married parents, both U. S. citizens,
the child ranks as a U. S. citizen at birth if either parent "has had a
residence in the United States or one of its outlying possessions, prior
to the birth of [the child]." §1401(a)(3) (1958 ed.); §1401(c) (2012 ed.)
(same).

if the father acknowledges paternity on the day of the child's birth and raises the child in the United States.[19] One cannot see in this driven-by-gender scheme the close means-end fit required to survive heightened scrutiny. See, *e.g.*, *Wengler* v. *Druggists Mut. Ins. Co.*, 446 U. S. 142, 151–152 (1980) (holding unconstitutional state workers' compensation death-benefits statute presuming widows' but not widowers' dependence on their spouse's earnings); *Westcott*, 443 U. S., at 88–89.

2

The Government maintains that Congress established the gender-based residency differential in §1409(a) and (c) to reduce the risk that a foreign-born child of a U. S. citizen would be born stateless. Brief for Petitioner 33. This risk, according to the Government, was substantially greater for the foreign-born child of an unwed U. S.-citizen mother than it was for the foreign-born child of an unwed U. S.-citizen father. *Ibid.* But there is little reason to believe that a statelessness concern prompted the diverse physical-presence requirements. Nor has the Government shown that the risk of statelessness disproportionately endangered the children of unwed mothers.

As the Court of Appeals pointed out, with one excep-

---

[19] Brief for Respondent 26, n. 9, presents this example: "Child A is born in Germany and raised there by his U. S.-citizen mother who spent only a year of her life in the United States during infancy; Child B is born in Germany and is legitimated and raised in Germany by a U. S.-citizen father who spent his entire life in the United States before leaving for Germany one week before his nineteenth birthday. Notwithstanding the fact that Child A's 'legal relationship' with his U. S.-citizen mother may have been established 'at the moment of birth,' and Child B's 'legal relationship' with his U. S.-citizen father may have been established a few hours later, Child B is more likely than Child A to learn English and assimilate U. S. values. Nevertheless, under the discriminatory scheme, only Child A obtains U. S. citizenship at birth." For another telling example, see Brief for Equality Now et al. as *Amici Curiae* 19–20.

tion,[20] nothing in the congressional hearings and reports on the 1940 and 1952 Acts "refer[s] to the problem of statelessness for children born abroad." 804 F. 3d, at 532–533. See Collins 2205, n. 283 (author examined "many hundreds of pre-1940 administrative memos . . . defend[ing] or explain[ing] recognition of the nonmarital foreign-born children of American mothers as citizens"; of the hundreds, "exactly one memo by a U. S. official . . . mentions the risk of statelessness for the foreign-born nonmarital children of American mothers as a concern"). Reducing the incidence of statelessness was the express goal of *other* sections of the 1940 Act. See 1940 Hearings 430 ("stateless[ness]" is "object" of section on foundlings). The justification for §1409's gender-based dichotomy, however, was not the child's plight, it was the mother's role as the "natural guardian" of a nonmarital child. See *supra*, at 9–13; Collins 2205 ("[T]he pronounced gender asymmetry of the Nationality Act's treatment of nonmarital foreign-born children of American mothers and fathers was shaped by contemporary maternalist norms regarding the mother's relationship with her nonmarital child—and

––––––––––

[20] A Senate Report dated January 29, 1952, is the sole exception. That Report relates that a particular problem of statelessness accounts for the 1952 Act's elimination of a 1940 Act provision the State Department had read to condition a citizen mother's ability to transmit nationality to her child on the father's failure to legitimate the child prior to the child's 18th birthday. See 1940 Act, §205, 54 Stat. 1140 ("*In the absence of . . . legitimation or adjudication* [during the child's minority], . . . the child" born abroad to an unmarried citizen mother "shall be held to have acquired at birth [the mother's] nationality status." (emphasis added)). The 1952 Act eliminated this provision, allowing the mother to transmit citizenship independent of the father's actions. S. Rep. No. 1137, 82d Cong., 2d Sess., 39 (1952) ("This provision establish[es] the child's nationality as that of the [citizen] mother *regardless of legitimation or establishment of paternity* . . . ." (emphasis added)). This sole reference to a statelessness problem does not touch or concern the different physical-presence requirements carried over from the 1940 Act into the 1952 Act.

the father's lack of such a relationship."). It will not do to "hypothesiz[e] or inven[t]" governmental purposes for gender classifications "*post hoc* in response to litigation." *Virginia*, 518 U. S., at 533, 535–536.

Infecting the Government's risk-of-statelessness argument is an assumption without foundation. "[F]oreign laws that would put the child of the U. S.-citizen mother at risk of statelessness (by not providing for the child to acquire the father's citizenship at birth)," the Government asserts, "would *protect* the child of the U. S.-citizen father against statelessness by providing that the child would take his mother's citizenship." Brief for Petitioner 35. The Government, however, neglected to expose this supposed "protection" to a reality check. Had it done so, it would have recognized the formidable impediments placed by foreign laws on an unwed mother's transmission of citizenship to her child. See Brief for Scholars on Statelessness as *Amici Curiae* 13–22, A1–A15.

Experts who have studied the issue report that, at the time relevant here, in "at least thirty countries," citizen mothers generally could not transmit their citizenship to nonmarital children born within the mother's country. *Id.*, at 14; see *id.*, at 14–17. "[A]s many as forty-five countries," they further report, "did not permit their female citizens to assign nationality to a nonmarital child born outside the subject country with a foreign father." *Id.*, at 18; see *id.*, at 18–21. In still other countries, they also observed, there was no legislation in point, leaving the nationality of nonmarital children uncertain. *Id.*, at 21–22; see Sandifer, A Comparative Study of Laws Relating to Nationality at Birth and to Loss of Nationality, 29 Am. J. Int'l L. 248, 256, 258 (1935) (of 79 nations studied, about half made no specific provision for the nationality of nonmarital children). Taking account of the foreign laws actually in force, these experts concluded, "the risk of parenting stateless children abroad was, as of [1940 and

1952], and remains today, substantial for unmarried U. S. fathers, a risk perhaps greater than that for unmarried U. S. mothers." Brief for Scholars on Statelessness as *Amici Curiae* 9–10; see *id.*, at 38–39. One can hardly characterize as gender neutral a scheme allegedly attending to the risk of statelessness for children of unwed U. S.- citizen mothers while ignoring the same risk for children of unwed U. S.-citizen fathers.

In 2014, the United Nations High Commissioner for Refugees (UNHCR) undertook a ten-year project to eliminate statelessness by 2024. See generally UNHCR, Ending Statelessness Within 10 Years, online at http:// www.unhcr.org/en-us/protection/statelessness/546217229/ special-report-ending-statelessness-10-years.html (all Internet materials as last visited June 9, 2017). Cognizant that discrimination against either mothers or fathers in citizenship and nationality laws is a major cause of statelessness, the Commissioner has made a key component of its project the elimination of gender discrimination in such laws. UNHCR, The Campaign To End Statelessness: April 2016 Update 1 (referring to speech of UNHCR "highlight[ing] the issue of gender discrimination in the nationality laws of 27 countries—a major cause of statelessness globally"), online at http://www.unhcr.org/ibelong/ wp-content / uploads / Campaign-Update-April-2016.pdf; UNHCR, Background Note on Gender Equality, Nationality Laws and Statelessness 2016, p. 1 ("Ensuring gender equality in nationality laws can mitigate the risks of statelessness."), online at http://www.refworld.org/docid/ 56de83ca4.html. In this light, we cannot countenance risk of statelessness as a reason to uphold, rather than strike out, differential treatment of unmarried women and men with regard to transmission of citizenship to their children.

In sum, the Government has advanced no "exceedingly persuasive" justification for §1409(a) and (c)'s gender-

specific residency and age criteria. Those disparate crite-
ria, we hold, cannot withstand inspection under a Consti-
tution that requires the Government to respect the equal
dignity and stature of its male and female citizens.[21]

## IV

While the equal protection infirmity in retaining a
longer physical-presence requirement for unwed fathers
than for unwed mothers is clear, this Court is not
equipped to grant the relief Morales-Santana seeks, *i.e.*,
extending to his father (and, derivatively, to him) the
benefit of the one-year physical-presence term §1409(c)
reserves for unwed mothers.

There are "two remedial alternatives," our decisions
instruct, *Westcott*, 443 U. S., at 89 (quoting *Welsh* v. *United
States*, 398 U. S. 333, 361 (1970) (Harlan, J., concurring
in result)), when a statute benefits one class (in this case,
unwed mothers and their children), as §1409(c) does, and
excludes another from the benefit (here, unwed fathers
and their children). "[A] court may either declare [the
statute] a nullity and order that its benefits not extend to
the class that the legislature intended to benefit, or it may
extend the coverage of the statute to include those who are
aggrieved by exclusion." *Westcott*, 443 U. S., at 89 (quot-
ing *Welsh*, 398 U. S., at 361 (opinion of Harlan, J.)).[22]

——————

[21] JUSTICE THOMAS, joined by JUSTICE ALITO, sees our equal protection
ruling as "unnecessary," *post*, at 1, given our remedial holding. But, "as
we have repeatedly emphasized, discrimination itself . . . perpetuat[es]
'archaic and stereotypic notions'" incompatible with the equal treat-
ment guaranteed by the Constitution. *Heckler* v. *Mathews*, 465 U. S.
728, 739 (1984) (quoting *Mississippi Univ. for Women* v. *Hogan*, 458
U. S. 718, 725 (1982)).

[22] After silently following the path Justice Harlan charted in *Welsh* v.
*United States*, 398 U. S. 333 (1970), in several cases involving gender-
based discrimination, see, *e.g.*, *Wiesenfeld*, 420 U. S., at 642, 653
(extending benefits); *Frontiero* v. *Richardson*, 411 U. S. 677, 690–691,
and n. 25 (1973) (plurality opinion) (same), the Court unanimously

"[W]hen the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler* v. *Mathews*, 465 U. S. 728, 740 (1984) (quoting *Iowa-Des Moines Nat. Bank* v. *Bennett*, 284 U. S. 239, 247 (1931); emphasis deleted). "How equality is accomplished . . . is a matter on which the Constitution is silent." *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413, 426–427 (2010).[23]

The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand. See *id.*, at 427 ("On finding unlawful discrimination, . . . courts may attempt, within the bounds of their institutional competence, to implement what the legislature would have willed had it been apprised of the constitutional infirmity."). See also *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 330 (2006) ("the touchstone for any decision about remedy is legislative

———————

adopted his formulation in *Califano* v. *Westcott*, 443 U. S. 76 (1979). See *id.*, at 89–90 (opinion for the Court); *id.*, at 94–95 (Powell, J., concurring in part and dissenting in part). The appropriate remedy, the *Westcott* majority held, was extension to unemployed mothers of federal family-aid unemployment benefits provided by statute only for families of unemployed fathers. *Id.*, at 90–93. In the dissent's view, nullification was the proper course. *Id.*, at 94–96.

[23] Because the manner in which a State eliminates discrimination "is an issue of state law," *Stanton* v. *Stanton*, 421 U. S. 7, 18 (1975), upon finding state statutes constitutionally infirm, we have generally remanded to permit state courts to choose between extension and invalidation. See *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413, 427 (2010). In doing so, we have been explicit in leaving open on remand the option of removal of a benefit, as opposed to extension. See, *e.g.*, *Orr* v. *Orr*, 440 U. S. 268, 283–284 (1979) (leaving to state courts remedy for unconstitutional imposition of alimony obligations on husbands but not wives); *Stanton*, 421 U. S., at 17–18 (how to eliminate unconstitutional age differential, for child-support purposes, between male and female children, is "an issue of state law to be resolved by the Utah courts").

intent").[24]

Ordinarily, we have reiterated, "extension, rather than nullification, is the proper course." *Westcott*, 443 U. S., at 89. Illustratively, in a series of cases involving federal financial assistance benefits, the Court struck discriminatory exceptions denying benefits to discrete groups, which meant benefits previously denied were extended. See, *e.g.*, *Goldfarb*, 430 U. S., at 202–204, 213–217 (plurality opinion) (survivors' benefits), aff'g 396 F. Supp. 308, 309 (EDNY 1975) (*per curiam*); *Jimenez* v. *Weinberger*, 417 U. S. 628, 630–631, and n. 2, 637–638 (1974) (disability benefits); *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 529–530, 538 (1973) (food stamps); *Frontiero*, 411 U. S., at 678–679, and n. 2, 691, and n. 25 (plurality opinion) (military spousal benefits). Here, however, the discriminatory exception consists of *favorable* treatment for a discrete group (a shorter physical-presence requirement for unwed U. S.-citizen mothers giving birth abroad). Following the same approach as in those benefits cases—

––––––––––

[24] We note, however, that a defendant convicted under a law classifying on an impermissible basis may assail his conviction without regard to the manner in which the legislature might subsequently cure the infirmity. In *Grayned* v. *City of Rockford*, 408 U. S. 104 (1972), for example, the defendant participated in a civil rights demonstration in front of a school. Convicted of violating a local "antipicketing" ordinance that exempted "peaceful picketing of any school involved in a labor dispute," he successfully challenged his conviction on equal protection grounds. *Id.*, at 107 (internal quotation marks omitted). It was irrelevant to the Court's decision whether the legislature likely would have cured the constitutional infirmity by excising the labor-dispute exemption. In fact, the legislature had done just that subsequent to the defendant's conviction. *Ibid.*, and n. 2. "Necessarily," the Court observed, "we must consider the facial constitutionality of the ordinance in effect when [the defendant] was arrested and convicted." *Id.*, at 107, n. 2. See also *Welsh*, 398 U. S., at 361–364 (Harlan, J., concurring in result) (reversal required even if, going forward, Congress would cure the unequal treatment by extending rather than invalidating the criminal proscription).

striking the discriminatory exception—leads here to extending the general rule of longer physical-presence requirements to cover the previously favored group.

The Court has looked to Justice Harlan's concurring opinion in *Welsh* v. *United States*, 398 U. S., at 361–367, in considering whether the legislature would have struck an exception and applied the general rule equally to all, or instead, would have broadened the exception to cure the equal protection violation. In making this assessment, a court should "'measure the intensity of commitment to the residual policy'"—the main rule, not the exception—"'and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation.'" *Heckler*, 465 U. S., at 739, n. 5 (quoting *Welsh*, 398 U. S., at 365 (opinion of Harlan, J.)).

The residual policy here, the longer physical-presence requirement stated in §§1401(a)(7) and 1409, evidences Congress' recognition of "the importance of residence in this country as the talisman of dedicated attachment." *Rogers* v. *Bellei*, 401 U. S. 815, 834 (1971); see *Weedin* v. *Chin Bow*, 274 U. S. 657, 665–666 (1927) (Congress "attached more importance to actual residence in the United States as indicating a basis for citizenship than it did to descent. . . . [T]he heritable blood of citizenship was thus associated unmistakeably with residence within the country which was thus recognized as essential to full citizenship." (internal quotation marks omitted)). And the potential for "disruption of the statutory scheme" is large. For if §1409(c)'s one-year dispensation were extended to unwed citizen fathers, would it not be irrational to retain the longer term when the U. S.-citizen parent is married? Disadvantageous treatment of marital children in comparison to nonmarital children is scarcely a purpose one can sensibly attribute to Congress.[25]

---

[25] Distinctions based on parents' marital status, we have said, are

Although extension of benefits is customary in federal benefit cases, see *supra*, at 23–24, n. 22, 25, all indicators in this case point in the opposite direction.[26]  Put to the choice, Congress, we believe, would have abrogated §1409(c)'s exception, preferring preservation of the general rule.[27]

V

The gender-based distinction infecting §§1401(a)(7) and 1409(a) and (c), we hold, violates the equal protection principle, as the Court of Appeals correctly ruled.  For the reasons stated, however, we must adopt the remedial course Congress likely would have chosen "had it been apprised of the constitutional infirmity."  *Levin*, 560 U. S., at 427.  Although the preferred rule in the typical case is

————————

subject to the same heightened scrutiny as distinctions based on gender.  *Clark* v. *Jeter*, 486 U. S. 456, 461 (1988).

[26] In crafting the INA in 1952, Congress considered, but did not adopt, an amendment that would have applied the shorter one-year continuous physical-presence requirement now contained in §1409(c) to all foreign-born children of parents with different nationalities.  See S. 2842, 82d Cong., 2d Sess., §301(a)(5) (1952).

[27] Compare with the remedial issue presented here suits under Title VII of the Civil Rights Act of 1964 challenging laws prescribing terms and conditions of employment applicable to women only, *e.g.*, minimum wage, premium pay, rest breaks, or lunch breaks.  Most courts, perhaps mindful of the mixed motives implicated in passage of such legislation (some conceiving the laws as protecting women, others, as discouraging employers from hiring women), and, taking into account the economic burdens extension would impose on employers, have invalidated the provisions.  See, *e.g.*, *Homemakers, Inc., of Los Angeles* v. *Division of Industrial Welfare*, 509 F. 2d 20, 22–23 (CA9 1974), aff'g 356 F. Supp. 1111 (1973) (ND Cal. 1973); *Burns* v. *Rohr Corp.*, 346 F. Supp. 994, 997–998 (SD Cal. 1972); *RCA del Caribe, Inc.* v. *Silva Recio*, 429 F. Supp. 651, 655–658 (PR 1976); *Doctors Hospital, Inc.* v. *Recio*, 383 F. Supp. 409, 417–418 (PR 1974); *State* v. *Fairfield Communities Land Co.*, 260 Ark. 277, 279–281, 538 S. W. 2d 698, 699–700 (1976); *Jones Metal Products Co.* v. *Walker*, 29 Ohio St. 2d 173, 178–183, and n. 6, 281 N. E. 2d 1, 6–9, and n. 6 (1972); *Vick* v. *Pioneer Oil Co.*, 569 S. W. 2d 631, 633–635 (Tex. Civ. App. 1978).

to extend favorable treatment, see *Westcott*, 443 U. S., at 89–90, this is hardly the typical case.[28]  Extension here would render the special treatment Congress prescribed in §1409(c), the one-year physical-presence requirement for U. S.-citizen mothers, the general rule, no longer an exception.  Section 1401(a)(7)'s longer physical-presence requirement, applicable to a substantial majority of children born abroad to one U. S.-citizen parent and one foreign-citizen parent, therefore, must hold sway.[29]  Going forward, Congress may address the issue and settle on a uniform prescription that neither favors nor disadvantages any person on the basis of gender.  In the interim, as the Government suggests, §1401(a)(7)'s now-five-year requirement should apply, prospectively, to children born to unwed U. S.-citizen mothers.  See Brief for Petitioner 12, 51; Reply Brief 19, n. 3.

\*     \*     \*

The judgment of the Court of Appeals for the Second Circuit is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of this case.

──────────

[28] The Court of Appeals found the remedial issue "the most vexing problem in this case."  804 F. 3d 520, 535 (2015).

[29] That Morales-Santana did not seek this outcome does not restrain the Court's judgment.  The issue turns on what the legislature would have willed.  "The relief the complaining party requests does not circumscribe this inquiry."  *Levin*, 560 U. S., at 427.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1191

_____

## JEFFERSON B. SESSIONS, III, ATTORNEY GENERAL, PETITIONER *v.* LUIS RAMON MORALES-SANTANA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 12, 2017]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, concurring in the judgment in part.

The Court today holds that we are "not equipped to" remedy the equal protection injury that respondent claims his father suffered under the Immigration and Nationality Act (INA) of 1952. *Ante*, at 23. I agree with that holding. As the majority concludes, extending 8 U. S. C. §1409(c)'s 1-year physical presence requirement to unwed citizen fathers (as respondent requests) is not, under this Court's precedent, an appropriate remedy for any equal protection violation. See *ante*, at 23. Indeed, I am skeptical that we even have the "power to provide relief of the sort requested in this suit—namely, conferral of citizenship on a basis other than that prescribed by Congress." *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 73 (2001) (Scalia, J., joined by THOMAS, J., concurring) (citing *Miller* v. *Albright*, 523 U. S. 420, 452 (1998) (Scalia, J., joined by THOMAS, J., concurring in judgment)).

The Court's remedial holding resolves this case. Because respondent cannot obtain relief in any event, it is unnecessary for us to decide whether the 1952 version of the INA was constitutional, whether respondent has third-party standing to raise an equal protection claim on behalf of his father, or whether other immigration laws (such as the current versions of §§1401(g) and 1409) are constitu-

tional.  I therefore concur only in the judgment reversing the Second Circuit.