**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FREE THE NIPPLE-FORT COLLINS, an
unincorporated association; BRITTIANY
HOAGLAND; SAMANTHA SIX,

     Plaintiffs - Appellees,

v.

CITY OF FORT COLLINS, COLORADO,

    Defendant - Appellant.

No. 17-1103

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-01308-RBJ)**
_____

Andrew D. Ringel of Hall & Evans, L.L.C, Denver, Colorado (Gillian Dale and
Christina S. Gunn of Hall & Evans, L.L.C., Denver, Colorado; and Carrie Mineart
Daggett and John R. Duval, Fort Collins City Attorney's Office, Fort Collins, Colorado,
with him on the briefs), for Defendant-Appellant.

Andrew McNulty (David A. Lane with him on the brief), of Killmer, Lane & Newman,
LLP, Denver, Colorado, for Plaintiffs-Appellees.
_____

Before **BRISCOE**, **HARTZ**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

    The city of Fort Collins, Colorado, enacted a public-nudity ordinance that

imposes no restrictions on male toplessness but prohibits women from baring their

breasts below the areola. *See* Fort Collins, Colo., Mun. Code § 17-142 (2015). In response, Free the Nipple, an unincorporated association, and two individuals, Brittiany Hoagland and Samantha Six (collectively, "the Plaintiffs"), sued the City in federal district court. They alleged (among other things) that the ordinance violated the Equal Protection Clause, U.S. Const. amend. XIV, § 1, and they asked for a preliminary injunction to halt enforcement of the ordinance. The district court agreed. It enjoined the City, pending the resolution of the case's merits, from implementing the ordinance "to the extent that it prohibits women, but not men, from knowingly exposing their breasts in public." *Free the Nipple–Fort Collins v. City of Fort Collins*, 237 F. Supp. 3d 1126, 1135 (D. Colo. 2017). The City then brought this interlocutory appeal to challenge the injunction.

The appeal presents a narrow question: Did the district court reversibly err in issuing the preliminary injunction? We answer no. Exercising interlocutory jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the district court's judgment and remand the case to that court for further proceedings consistent with this opinion.

**BACKGROUND**

In 2015, after substantial public debate, the Fort Collins city council enacted this public-nudity ordinance:

> No female who is ten (10) years of age or older shall knowingly appear in any public place with her breast exposed below the top of the areola and nipple while located: (1) In a public right-of-way, in a natural area, recreation area or trail, or recreation center, in a public building, in a public square, or while located in any other public place; or (2) On private property if the person is in a place that can be viewed from the ground level by another who is located on public property and who does not take extraordinary steps, such

2

as climbing a ladder or peering over a screening fence, in order to achieve a point of vantage. . . . . The prohibition [on female toplessness] does not extend to women breastfeeding in places they are legally entitled to be.

Fort Collins, Colo., Mun. Code § 17-142(b), (d). Any person who violates this ordinance "shall be guilty of a misdemeanor" and "shall be punished" by a fine of up to $2,650, or up to 180 days in jail, or both. *Id.* § 1-15(a).

The Plaintiffs immediately sued the City in federal district court, alleging that the public-nudity ordinance violates the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as well as the Equal Rights Amendment to the Colorado Constitution. Their complaint includes a jury-trial demand and a prayer for relief asking the court (1) to declare the ordinance "unconstitutional on its face and as applied to [the] Plaintiffs" and (2) to prevent the ordinance's enforcement. Appellant's App. vol. 1 at 20. Separately, the Plaintiffs moved for a preliminary injunction blocking enforcement of the ordinance and "prohibit[ing] [the City] from discriminatorily arresting [the] Plaintiffs, and all others similarly situated, when they engage in the protected activity of standing topless in public places in Fort Collins, Colorado." *Id.* at 22.

The City countered with a motion to dismiss arguing that the Plaintiffs had failed to state any claim on which relief could be granted, *see* Fed. R. Civ. P. 12(b)(6), and a response to the Plaintiffs' preliminary-injunction motion. In the latter, the City asserted that a preliminary injunction would unfairly burden the public "by exposure to public nudity" and urged the court to deny the motion. Appellant's App. vol. 2 at 33.

3

The district court first addressed the City's motion to dismiss. It granted the motion on the Plaintiffs' free-speech claim, agreeing with the City that "topless protests" aren't protected speech, but allowed the Plaintiffs' (federal) Equal Protection Clause and (state) Equal Rights Amendment claims to proceed. *Free the Nipple–Fort Collins v. City of Fort Collins*, 216 F. Supp. 3d 1258, 1262 (D. Colo. 2016). Next, the court turned to the Plaintiffs' preliminary-injunction motion. After holding a hearing on the matter, it granted the motion, ruling that the ordinance likely violated the Equal Protection Clause,[1] and issued the requested injunction. *Free the Nipple*, 237 F. Supp. 3d at 1128. Pending trial (or other resolution of the case), the preliminary injunction blocks the City from enforcing its public-nudity ordinance "to the extent that it prohibits women, but not men, from knowingly exposing their breasts in public." *Id.* at 1135.

The City then brought this interlocutory appeal defending the constitutionality of its public-nudity ordinance and challenging the preliminary injunction.

## DISCUSSION

In its appeal, the City asks us to vacate the district court's preliminary injunction so that it can fully enforce its public-nudity ordinance.[2] The City argues that the

---

[1] When the district court ruled in the Plaintiffs' favor, it relied on the federal Constitution. The court left the Plaintiffs' state-law claim, premised on the Colorado Constitution's Equal Rights Amendment, for the Colorado courts to assess. *Free the Nipple*, 237 F. Supp. 3d at 1133 n.4; *see also* Colo. Const. art. II, § 29 ("Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex."). In resolving this appeal, we likewise consider only the federal Equal Protection Clause.

[2] The City goes further, urging us to "dismiss the Plaintiffs' equal protection claims in their entirety with prejudice." Appellant's Opening Br. at 37. But we lack

4

ordinance's unequal treatment of male and female toplessness survives constitutional scrutiny, making it likely that the Plaintiffs will lose a merits trial and, in the meantime, precluding them from getting injunctive relief. Before we address the City's argument, we define our standard of review and explain the rules governing the grant (or denial) of a preliminary injunction. We'll then apply that framework to determine whether the district court reversibly erred when it issued the preliminary injunction.

## I.     Standard of Review

District courts have discretion over whether to grant preliminary injunctions, *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 889 (10th Cir. 1989), and we will disturb their decisions only if they abuse that discretion, *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record. *Id.* (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). As we review a district court's decision to grant or deny a preliminary injunction, we thus examine the court's factual findings for clear error and its legal conclusions de novo. *Id.*

---

authority to do that until the district court, in the first instance, issues a final order resolving the Plaintiffs' claims. In the meantime, 28 U.S.C. § 1292(a)(1) grants us interlocutory jurisdiction to review only the district court's preliminary-injunction order. That review lets us engage with the merits of the Plaintiffs' claims, but only to the extent that the merits affect our preliminary-injunction analysis.

## II. The Legal Standards Governing Preliminary Injunctions

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Enter. Mgmt. Consultants, Inc.*, 883 F.2d at 888. To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's "substantially likely to succeed on the merits," (2) that she'll "suffer irreparable injury" if the court denies the injunction, (3) that her "threatened injury" (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't "adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

But courts "disfavor" some preliminary injunctions and so require more of the parties who request them. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial. *Id.* Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. *Awad*, 670 F.3d at 1125 (citing *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048–49 (10th Cir. 2007)); *see also Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997) (explaining that an injunction is "mandatory" if "its terms would alter, rather than preserve, the status quo by commanding some positive act"). To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make

a "strong showing" that these tilt in her favor. *Fish*, 840 F.3d at 724 (quoting *Beltronics*, 562 F.3d at 1071).

On appeal, the City invokes an even higher standard that requires movants who, like the Plaintiffs, seek to disturb the status quo to "demonstrate not only that the four requirements for a preliminary injunction are met but also that they weigh heavily and compellingly in [the movants'] favor." Appellant's Opening Br. at 8 (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)). But we "jettison[ed]" the heavily-and-compellingly requirement over a decade ago. *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd sub nom Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006). Today, "the requirement that a movant requesting a disfavored injunction must make a showing that the traditional four factors weigh heavily and compellingly in [the movant's] favor is no longer the law of the circuit." *Schrier*, 427 F.3d at 1261.

The preliminary injunction at issue here prevents the City from fully enforcing its public-nudity ordinance. In so doing, the district court concluded that the injunction both "alters the status quo and affords the movants all the relief they could recover at the conclusion of a full trial on the merits." *Free the Nipple*, 237 F. Supp. 3d at 1130. This conclusion led the district court to apply the heightened disfavored-injunction standard and to require strong showings from the Plaintiffs on the first and third factors. *Id.* And though we have doubts that the heightened standard applies here, we need not decide

7

which standard to apply—the plaintiffs prevail under the heightened standard and, therefore, under both.[3]

## III.    Application

On appeal, the City disputes that the Plaintiffs can prevail on any of the four preliminary-injunction factors, but its argument hinges on the first factor: the likelihood that the Plaintiffs will succeed on the merits. According to the City, all four preliminary-injunction factors favor the City because the Plaintiffs lack a viable equal-protection claim and will likely lose on the merits. The fate of this preliminary injunction thus turns largely, if not entirely, on the strength of the Plaintiffs' equal-protection claim. But the City challenges each preliminary-injunction factor, so we address each (though we focus on the first).

---

[3] Though the Plaintiffs have not contested the district court's decision to apply the heightened standard, that decision was likely in error. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246–50 (10th Cir. 2001) (explaining that a preliminary injunction falls into the all-the-relief category only if its effect, "once complied with, cannot be undone"; here, we probably *can* put the toothpaste back in the tube—if the plaintiffs lose on the merits after a trial, then Fort Collins may fully enforce its public-nudity ordinance (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995))); 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 (3d ed. & Nov. 2018 update) (defining the status quo as "the last peaceable uncontested status existing between the parties before the dispute developed"—which, in this case, would be the status existing *before* Fort Collins enacted the challenged public-nudity ordinance (internal quotation marks and citations omitted)). But here, the error makes no difference: Logically, movants who can satisfy the heightened standard must also be able to satisfy the lower standard applicable to typical preliminary injunctions. And because we agree with the district court that the Plaintiffs can satisfy the heightened standard, we conclude that they can also satisfy the ordinary standard, and we decline to delve more deeply into questions not presented here—whether the requested preliminary injunction altered the status quo and whether it gave the Plaintiffs all the relief that they could have won at a full merits trial.

### A. The First Factor: Likelihood of Success on the Merits

The heightened standard applicable to disfavored preliminary injunctions requires the Plaintiffs to make a strong showing that their equal-protection claim is substantially likely to succeed on its merits. *Fish*, 840 F.3d at 723–24. The City contests the district court's conclusion that the Plaintiffs made this showing. That conclusion, according to the City, reflects "a fundamental misunderstanding" of Supreme Court precedent and "a misapprehension of the purpose and effect" of the public-nudity ordinance. Appellant's Opening Br. at 9.

We begin our analysis with an outline of the relevant equal-protection principles. Applying those principles, we then assess the merits of the Plaintiffs' equal-protection claim to determine whether the district court abused its discretion when it concluded that the likelihood-of-success factor tilts toward the Plaintiffs.

### 1. The Equal Protection Clause and Gender-Based Classifications

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause, as the U.S. Supreme Court has interpreted it, directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "At a minimum," it requires that any statutory classification be "rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). But more stringent judicial scrutiny attaches to classifications based on certain "suspect" characteristics. *See City of Cleburne*, 473 U.S. at 440. These

9

(often immutable) characteristics seldom provide a "sensible ground for differential treatment." *Id.*

Gender, for instance, "frequently bears no relation to ability to perform or contribute to society," and statutes that differentiate between men and women "very likely reflect outmoded notions" about their "relative capabilities." *Id.* at 440–41 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)). As a result, gender-based classifications "call for a heightened standard of review," *id.* at 440, a standard dubbed "intermediate scrutiny" because it lies "[b]etween the[] extremes of rational basis review and strict scrutiny." *Clark*, 486 U.S. at 461. To survive intermediate scrutiny, a gender-based classification needs "an exceedingly persuasive justification." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994). The classification must serve "important governmental objectives" through means "substantially related to" achieving those objectives. *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)); *see also Craig v. Boren*, 429 U.S. 190, 197–99 (1976) (defining, for the first time, this level of means–ends scrutiny).

The City acknowledges that a female-only topless ban is a gender-based classification and that, to pass muster under the Equal Protection Clause, gender-based classifications must satisfy intermediate scrutiny. But instead of drawing the logical conclusion—that female-only topless bans warrant intermediate scrutiny—the City interrupts the syllogism. It asserts that "[t]he fundamental requirement of *any* cognizable gender discrimination claim is *invidious discrimination*, not simply

10

classification on the basis of gender." Appellant's Opening Br. at 10 (bolding removed).

Some of the Court's early equal-protection cases, such as 1979's *Parham v. Hughes*, did treat invidiousness as a "threshold" inquiry. 441 U.S. 347, 351 (1979). Yet *Parham*, if never overruled, is outdated in light of the Court's more modern equal-protection jurisprudence.[4] Since then, the Court has "consistently" recognized that statutes supposedly based on "reasonable considerations" may in fact reflect "archaic and overbroad generalizations about gender" or "outdated misconceptions concerning the role of females in the home rather than in the marketplace and world of ideas." *J.E.B.*, 511 U.S. at 135 (quoting *Schlesinger v. Ballard*, 419 U.S. 498, 506–07 (1975), and *Craig*, 429 U.S. at 198–99). Today, heightened scrutiny "attends 'all gender-based classifications.'" *Morales-Santana*, 137 S. Ct. at 1689 (quoting *J.E.B.*, 511 U.S. at 136).

---

[4] *Parham* is a vestige of a period, not so long ago, when the Court didn't consider gender a suspect classification, a view that allowed the Court to ratify women's near-universal exclusion from jury service. As late as 1961, the Court wrote that because women were "the center of home and family life," states could "relieve[]" them "from the civic duty of jury service" without offending the Fourteenth Amendment. *Hoyt v. Florida*, 368 U.S. 57, 62, 65 (1961), *overruled by Taylor v. Louisiana*, 419 U.S. 522, 531, 532–34 (1975) (dodging *Hoyt*'s Fourteenth Amendment holding by relying on the Sixth Amendment, a move that the Court eventually—in 1991—acknowledged as overruling *Hoyt*), *as recognized in Payne v. Tennessee*, 501 U.S. 808, 828 n.1 (1991); *see also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (relegating *Hoyt* to "an era when the lawbooks of our Nation were rife with overbroad generalizations about the way men and women are").

11

Invidiousness still matters, but only in challenges to facially gender-neutral statutes that disproportionately and adversely impact one gender. *See Personnel Adm'r v. Feeney*, 442 U.S. 256, 259, 273–74 (1979) (challenging Massachusetts's hiring preference for veterans, which worked "overwhelmingly to the advantage of males"). Here, however, the City has enacted, and the Plaintiffs have challenged, a public-nudity ordinance that prescribes one rule for women, requiring them to cover their breasts below the areola, and a different rule for men, allowing them to go topless as they please. Fort Collins, Colo., Mun. Code § 17-142(b). The ordinance creates a gender classification on its face, taking invidiousness out of the equation. The success of the Plaintiffs' equal-protection claim depends only on whether the ordinance survives intermediate scrutiny.

We turn to that question next, as we address the City's attack on the merits of the Plaintiffs' equal-protection claim and defense of its public-nudity ordinance.

### 2. The Merits of the Plaintiffs' Equal-Protection Claim

The district court characterized as "little more than speculation" the City's claim that banning only female toplessness furthered important governmental objectives. *Free the Nipple*, 237 F. Supp. 3d at 1131. Instead, the court found:

> The ordinance discriminates against women based on the generalized notion that, regardless of a woman's intent, the exposure of her breasts in public (or even in her private home if viewable by the public) is necessarily a sexualized act. Thus, it perpetuates a stereotype engrained in our society that female breasts are primarily objects of sexual desire whereas male breasts are not.

12

*Id.* at 1132. As a result, the court concluded, the Plaintiffs demonstrated "a strong likelihood that they will succeed at the permanent injunction trial in establishing that [the City's public-nudity ordinance] violates the Equal Protection Clause." *Id.* at 1133.

The City challenges this conclusion on appeal. It argues that, "in light of the differences between male and female breasts," prohibiting only female toplessness *is* substantially related to an important governmental objective, as a sizeable majority of other courts have found. Appellant's Opening Br. at 19. We address the City's argument in two parts. First, we discuss the focus of the City's defense—the physical differences between male and female breasts—and explain how such differences affect the constitutional analysis. Second, we determine whether the City's female-only toplessness ban survives constitutional scrutiny.

### a.       *Physical Differences*

In defending the constitutionality of its public-nudity ordinance, the City emphasizes the physical, social, and sexual characteristics particular to the female breast. Citing a Wikipedia article (which is titled "Breast" but discusses only the female version) the City argues that women's breasts "have social and sexual characteristics," although their "primary function" is breastfeeding infants. Appellant's Opening Br. at 12; *see Breast*, Wikipedia: The Free Encyclopedia, https://en.wikipedia.org/wiki/Breast (last visited Apr. 18, 2018). The article, as quoted by the City, describes female breasts ("and especially the nipples") as "among the various human erogenous zones" and claims that "it is common to press or

13

massage them with hands or orally before or during sexual activity." Appellant's Opening Br. at 12. Breasts, the City claims, "can figure prominently in a woman's perception of her body image and sexual attractiveness" and "have a hallowed sexual status" in Western culture, "arguably more fetishized than either sex's genitalia." *Id.* But "the sexualization of women's breasts," according to the City, "is not solely a product of societal norms, but of biology." *Id.* at 13. Research suggests that women's breasts have greater "tactile sensitivity" than men's. *Id.* at 13–14 (citing J.E. Robinson & R.V. Short, *Changes in Breast Sensitivity at Puberty, During the Menstrual Cycle, and at Parturition*, British Medical Journal 1, 1188–91 (1977)).[5]

Though we're wary of Wikipedia's user-generated content, we agree with the district court that "[o]f course" inherent physical differences exist between women's and men's breasts—most obviously, the unique potential to nourish children. *Free the Nipple*, 237 F. Supp. 3d at 1132; *see also Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 976 n.19 (C.D. Cal. 2010) (discussing the dangers of relying on Wikipedia); R. Jason Richards, *Courting Wikipedia*, 44 Trial 62 (Apr. 2008) ("Since when did a Web site that any Internet surfer can edit become an authoritative source by which . . . lawyers could craft legal arguments[] and judges could issue precedents?"). But that doesn't resolve the constitutional question.

---

[5] The City also points to printouts, appended to its preliminary-hearing brief, summarizing data from Alfred Kinsey's 1948 and 1953 studies showing that 98% of couples engage in "manual stimulation of [the] female breast" and 93% in "oral stimulation of [the] female breast" during foreplay. Appellant's App. vol. 3 at 111.

14

"Physical differences between men and women," the Court has recognized, "are enduring." *Virginia*, 518 U.S. at 533. And in some cases, the Court has found, such differences justify differential treatment. *See, e.g.*, *Nguyen v. INS*, 533 U.S. 53, 58–59, 68 (2001) (upholding a paternal-acknowledgment requirement in a citizenship statute that treated unwed mothers differently than unwed fathers, in part because the statute addressed "an undeniable difference" between women and men: "at the moment of birth . . . the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father"). But not always.

Any law premised on "generalizations about 'the way women are'"—or the way men are—will fail constitutional scrutiny because it serves no important governmental objective. *Virginia*, 518 U.S. at 550; *see also Morales-Santana*, 137 S. Ct. at 1692 (rejecting, as one such generalization, "the obsolescing view that 'unwed fathers [are] invariably less qualified and entitled than mothers' to take responsibility for nonmarital children"). Generalizations, the Court has explained, "have a constraining impact, descriptive though they may be of the way many people still order their lives." *Morales-Santana*, 137 S. Ct. at 1692–93. They "may 'creat[e] a self-fulfilling cycle of discrimination that force[s] women to continue to assume the role of primary family caregiver.'" *Id.* at 1693 (alteration in original) (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003)).

So, as we inquire into a gender-based classification's objectives, we must beware of stereotypes and their potential to perpetuate inequality. "Even if

15

stereotypes frozen into legislation have 'statistical support,'" we must "reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Morales-Santana*, 137 S. Ct. at 1693 n.13 (citing *J.E.B.*, 511 U.S. at 139 n.11); *see also* Cary Franklin, *The Anti-Stereotyping Principle in Constitutional Sex Discrimination Law*, 85 N.Y.U. L. Rev. 83, 138 n.296 (2010) ("The anti-stereotyping principle pervades both stages of [intermediate scrutiny], shaping what constitutes an important interest and what means qualify as sufficiently narrowly tailored to serve this interest.").

With those principles in mind, we now apply the intermediate-scrutiny doctrine to the City's female-only toplessness ban.

### b. Intermediate Scrutiny

To determine whether the City's public-nudity ordinance survives intermediate scrutiny, we first identify the City's proffered reasons for enacting a gender-based classification. Then, we ask whether the City's reasons qualify as important governmental objectives and, if so, whether the gender-based means employed substantially serve those objectives. *See Morales-Santana*, 137 S. Ct. at 1690 (citing *Virginia*, 518 U.S. at 533).

The City argues that the inherently sexual nature of the female breast, as opposed to the male breast, raises "myriad concerns" with "permitting adult females to go topless in public without restriction." Appellant's Opening Br. at 18. The City refers us to the preliminary-injunction hearing, where three city officials—the deputy city manager, the assistant chief of police, and the city aquatics supervisor—

16

described some of these concerns. The officials testified that female toplessness could disrupt public order, lead to distracted driving, and endanger children. Citing these concerns, the City claims that prohibiting only female toplessness serves to protect children from public nudity, to maintain public order, and to promote traffic safety.[6] We address each rationale in turn.

i.      *Protecting Children from Public Nudity*[7]

The capacity to breastfeed is the first attribute that, the City claims, sets the female breast apart. Yet the City's public-nudity ordinance expressly exempts breastfeeding women from the female-toplessness ban, so even children who weren't exposed to their mothers' breasts as breastfeeding infants may still see a naked female breast if they pass a woman breastfeeding in public—her right under state law. Fort Collins, Colo., Mun. Code § 17-142(d); *see also* Colo. Rev. Stat. § 25-6-302 (2017) ("A mother may breast-feed in any place she has a right to be."). In that context, few would consider the sight of the woman's breast dangerous.

---

[6] In its one-sentence summary of "the governmental issues at stake," the City mentions two other interests: "advancing the quiet enjoyment of private property" and "the impact on businesses." Appellant's Opening Br. at 19. Yet the City doesn't explain how the public-nudity ordinance affects these interests, so we don't consider them any further.

[7] Before the district court, the City asserted the "protection of children" as justification for the female-only toplessness ban. *See* Appellant's App. vol. 3 at 142, 251:7–8; *accord Free the Nipple*, 237 F. Supp. 3d at 1130. On appeal, the City characterizes this objective a little differently, as "supporting parental rights to control children's exposure to public nudity." Appellant's Opening Br. at 19. But the City doesn't explain why it changed its mind or how (if at all) this nuance affects the analysis, so we address only the objective better rooted in the record—the protection of children.

17

The need to protect children arises, instead, from the City's fear of topless women "parading in front of elementary schools, or swimming topless in the public pool"—scenarios that it described to the court at the preliminary-injunction hearing. *Free the Nipple*, 237 F. Supp. 3d at 1131. But laws in the neighboring cities of Boulder and Denver, and in many other jurisdictions, allow female toplessness, and the City presented no evidence of any harmful fallout. *Id.*; *see also* Boulder, Colo. Mun. Code § 5-6-13 (2017); Denver, Colo. Mun. Code § 38-157.1 (2017). In fact, the district court found, the City presented no evidence "that a law permitting public exposure of female breasts would have a significantly negative impact on the public." *Free the Nipple*, 237 F. Supp. 3d at 1131. And absent contrary proof we, like the district court, doubt that without a female-toplessness ban on the books, topless women would "regularly walk[] through downtown Fort Collins," "parad[e]" past elementary schools, or swim in public pools. *Id.*

We're left, as the district court was, to suspect that the City's professed interest in protecting children derives not from any morphological differences between men's and women's breasts but from negative stereotypes depicting women's breasts, but not men's breasts, as sex objects. *Id.* ("[C]hildren do not need to be protected from the naked female breast itself but from the negative societal norms, expectations, and stereotypes associated with it."); *cf. Tagami v. City of Chicago*, 875 F.3d 375, 382 (7th Cir. 2017) (Rovner, J., dissenting) ("The City's claim therefore boils down to a desire to perpetuate a stereotype that female breasts

18

are primarily the objects of desire, and male breasts are not."), *cert. denied*, 138 S. Ct. 1577 (2018).

In support of this view, the district court relied on the testimony of Dr. Tomi-Ann Roberts, a psychology professor and witness for the Plaintiffs. At the preliminary-injunction hearing, Dr. Roberts testified that our society's sexualization of women's breasts—rather than any unique physical characteristic—has engrained in us the stereotype that the primary purpose of women's breasts is sex, not feeding babies. The district court found Dr. Roberts credible and concluded, based on her testimony, that "the naked female breast is *seen* as disorderly or dangerous because society, from Renaissance paintings to Victoria's Secret commercials, has conflated female breasts with genitalia and stereotyped them as such." *Free the Nipple*, 237 F. Supp. 3d at 1133.

But laws grounded in stereotypes about the way women are serve no important governmental interest. *Morales-Santana*, 137 S. Ct. at 1692–93; *Virginia*, 518 U.S. at 550. To the contrary, legislatively reinforced stereotypes tend to "create[] a self-fulfilling cycle of discrimination." *Hibbs*, 538 U.S. at 736. Thus, the sex-object stereotype, according to Dr. Roberts, "serves the function of keeping women in their place." Appellant's App. vol. 3 at 192:11. And as the district court found, perpetuating the sex-object stereotype "leads to negative cognitive, behavioral, and emotional outcomes for both women and men." *Free the Nipple*, 237 F. Supp. 3d at 1132. The court noted, for instance, that Dr. Roberts had testified about research linking the sexual objectification of women to the view that, at younger and younger

19

ages, women are "appropriate targets of [sexual] assault." Appellant's App. vol. 3 at 194:22–23.

Accordingly, we reject the City's claim that protecting children from public nudity qualifies as an important governmental objective substantially served by the City's female-only toplessness ban.

ii. *Maintaining Public Order and Promoting Traffic Safety*

In the abstract, we agree that public order and traffic safety are important governmental objectives. The absence of either could be fatal. But the justification for a gender-based classification "must be genuine, not hypothesized," and "it must not rely on overbroad generalizations." *Virginia*, 518 U.S. at 533. Here, we suspect that enacting the public-nudity ordinance had less to do with the City's professed objectives and more to do with the sex-object stereotype that the district court described. *See Free the Nipple*, 237 F. Supp. 3d at 1132.

For one thing, in asserting that its female-only toplessness ban substantially furthers important governmental objectives, the City mostly relies on cases holding that nebulous concepts of public morality—not traffic safety or public order— justified similar bans. In one of those cases, for example, the Fourth Circuit tied a public-nudity ordinance like the City's to the "widely recognized" governmental interest in "protecting the moral sensibilities of that substantial segment of society that still does not want to be exposed willy-nilly to public displays of various portions of their fellow citizens' anatomies that traditionally in this society have been

20

regarded as erogenous zones," portions that "still include (whether justifiably or not in the eyes of all) the female, but not the male, breast." *United States v. Biocic*, 928 F.2d 112, 115–16 (4th Cir. 1991); *accord Tagami*, 875 F.3d at 379; *Ways v. City of Lincoln*, 331 F.3d 596, 600 (8th Cir. 2003).

For another thing, although the City itself never asserted public morality as a justification for banning female toplessness, notions of morality may well underlie its assertions that conflicts will break out, and distracted drivers will crash, if it allows women to be topless in public. But such notions, like the fear that topless women will endanger children, originate from the sex-object stereotype of women's breasts. And as we've explained, that stereotype doesn't stand up to scrutiny. *Cf. People v. Santorelli*, 600 N.E.2d 232, 236 (N.Y. 1992) (Titone, J., concurring) ("One of the most important purposes to be served by the Equal Protection Clause is to ensure that 'public sensibilities' grounded in prejudice and unexamined stereotypes do not become enshrined as part of the official policy of government."); *accord Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015); *see also Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 850 (1992) ("Our obligation is to define the liberty of all, not to mandate our own moral code.").

So what's left? A female-only toplessness ban strikes us as an unnecessary and overbroad means to maintain public order and promote traffic safety "when more accurate and impartial lines can be drawn." *Morales-Santana*, 137 S. Ct. at 1693 n.13; *see also Craig*, 429 U.S. at 208–09 & n.22 (striking down a gender-based differential in the age at which men and women could legally buy 3.2% beer because

21

"the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the drinking tendencies of aggregate groups"). For instance, the City could abate sidewalk confrontations by increasing the penalties for engaging in offensive conduct. And to reduce distracted driving, the City could target billboards designed to draw drivers' eyes from the road. But the City can't impede women's (and not men's) ability to go topless unless it establishes the tight means–ends fit that intermediate scrutiny demands.

We recognize that ours is the minority viewpoint. Most other courts, including a recent (split) Seventh Circuit panel, have rejected equal-protection challenges to female-only toplessness bans. *E.g.*, *Tagami*, 875 F.3d at 380.[8] *But see id.* at 383 (Rovner, J., dissenting) ("Whether out of reverence or fear of female breasts, Chicago's ordinance calls attention to and sexualizes the female form and imposes a burden of public modesty on women alone, with ramifications that likely extend beyond the public way." (citing *Free the Nipple*, 237 F. Supp.3d at 1133)); *Santorelli*, 600 N.E.2d at 237 (Titone, J., concurring) ("[T]he People have offered nothing to justify a law that discriminates against women by prohibiting them from removing their tops and exposing their bare chests in public as men are routinely

---

[8] *See also State v. Lilley*, No. 2017-0116, 2019 WL 493721, at *5 & n.3 (N.H. Feb. 8, 2019) (concluding, in a divided opinion, that a public-nudity ordinance's female-only toplessness ban comports with the New Hampshire Constitution's Equal Rights Amendment, and—in a footnote—with the federal Equal Protection Clause).

permitted to do."). None of these decisions binds us, though; nor does their sheer volume sway our analysis.

As we interpret the arc of the Court's equal-protection jurisprudence, ours is the constitutionally sound result. At least since *Virginia*, that arc bends toward requiring more—not less—judicial scrutiny when asserted physical differences are raised to justify gender-based discrimination, while casting doubt on public morality as a constitutional reason for gender-based classifications. *See, e.g.*, *Morales-Santana*, 137 S. Ct. at 1689 (clarifying that "all gender-based classifications" are subject to "heightened scrutiny" (quoting *J.E.B.*, 511 U.S. at 136)); *Virginia*, 518 U.S. at 533 ("'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity."); Franklin, *supra*, at 145–46 ("[T]he Court's opinion [in *Virginia*] suggests that equal protection law should be particularly alert to the possibility of sex stereotyping in contexts where 'real' differences are involved, because these are the contexts in which sex classifications have most often been used to perpetuate sex-based inequality.").

For these reasons, we believe that the district court correctly analyzed the Plaintiffs' equal-protection claim. The court didn't abuse its discretion in concluding that because the Plaintiffs made a strong showing of their likelihood of success on the merits, the first preliminary-injunction factor weighed in their favor.

## B. The Second Factor: Irreparable Injury

The second preliminary-injunction factor asks whether irreparable injury will befall the movants without an injunction. *Awad*, 670 F.3d at 1131. Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury. *Id.*; *accord* Wright & Miller, *supra*, § 2948.1. The district court applied that principle here, concluding that the City's public-nudity ordinance inflicts irreparable harm by violating the Plaintiffs' right to equal protection under the law. *See Free the Nipple*, 237 F. Supp. 3d at 1134.

On appeal, the City acknowledges that well-settled law supports the constitutional-violation-as-irreparable-injury principle. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Awad*, 670 F.3d at 1131; *accord* Wright et al., *supra*, § 2948.1. And the City seems to concede that in the context of constitutional claims, the principle collapses the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury. The City nevertheless contests its application here on the ground that neither the district court nor the Plaintiffs cited a decision analyzing the specific injury asserted here: an equal-protection violation from a prohibition on public nudity.

We're not persuaded. What makes an injury "irreparable" is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. *Awad*, 670 F.3d at 1131. Any deprivation of any constitutional right fits that bill. *See Adams ex rel. Adams v. Baker*, 919 F. Supp. 1496, 1504–05 (D. Kan. 1996) (concluding that excluding the plaintiff from the wrestling team because of her gender deprived her of

24

her right to equal protection and that this deprivation "itself" constituted irreparable harm). Here, absent the preliminary injunction, the Plaintiffs, and all women in Fort Collins, risk criminal sanctions for making a choice—to appear topless in public—that men may make scot-free. *See* Fort Collins, Colo. Mun. Code § 17-142. We've already concluded that this gender disparity violates the Equal Protection Clause, so we agree with the district court that the Plaintiffs need to show no further irreparable harm.

Accordingly, we conclude that the district court didn't abuse its discretion in concluding that the Plaintiffs met the irreparable-injury requirement.

### C.     The Third Factor: The Balance of Harms

The third preliminary-injunction factor involves balancing the irreparable harms identified above against the harm that the preliminary injunction causes the City. *Fish*, 840 F.3d at 754. Under the heightened disfavored-injunction standard, the Plaintiffs need to make a strong showing that the balance of harms tips in their favor. *Awad*, 670 F.3d at 1131. When a constitutional right hangs in the balance, though, "even a temporary loss" usually trumps any harm to the defendant. Wright et al., *supra*, § 2948.2 & n.10. In this case, according to the district court, the Plaintiffs met their third-factor burden because the deprivation of their right to equal protection outweighed the stakes for the City, which the court defined as the public's interest in morality. *Free the Nipple*, 237 F. Supp. 3d at 1134.

The City contests that conclusion on appeal, asking "how any injury [the Plaintiffs] might sustain from being required to wait to bare their breasts in public

25

until after this matter is concluded outweighs the City's interest in maintaining a law that was supported by the majority of its citizens and unanimously adopted by its City Council." Appellant's Opening Br. at 35. But "being required to wait to bare their breasts in public" deprives the Plaintiffs of a constitutional right, while the City has no interest in keeping an unconstitutional law on the books. *Cf. Awad*, 670 F.3d at 1131 ("[W]hen the law that voters wish to enact is likely unconstitutional, their interests do not outweigh [a plaintiff's interest] in having his constitutional rights protected.").

For these reasons, we conclude that the district court didn't abuse its discretion in determining that the balance of harms tips in the Plaintiffs' favor, even under the "strong showing" standard applicable to disfavored injunctions.

### D.    The Fourth Factor: The Public Interest

The last preliminary-injunction factor requires that the injunction not be against the public interest. *Awad*, 670 F.3d at 1132. But as the district court wrote, it's "always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple*, 237 F. Supp. 3d at 1134 (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). On appeal, the City disputes that the public-nudity ordinance is unconstitutional, but it cites no law casting doubt on the public's interest in preserving constitutional rights. *See Awad*, 670 F.3d at 1132; *see also Baker*, 919 F. Supp. at 1505 ("The public interest would best be served by enjoining the defendants from infringing on the plaintiff's right to equal protection.").

26

As we explained above, the ordinance likely is unconstitutional, so we find the City's argument unconvincing. We conclude that the district court didn't abuse its discretion in ruling that the public-interest factor weighs in the Plaintiffs' favor.

\* \* \*

In sum, because we agree with the district court that each preliminary-injunction factor favored the Plaintiffs, we also agree that the Plaintiffs should prevail on their preliminary-injunction motion. Thus, the district court didn't abuse its discretion in issuing the injunction.

**CONCLUSION**

For these reasons, we affirm the district court's order granting the Plaintiffs' motion for a preliminary injunction, and we remand the case to the district court for further proceedings consistent with this opinion.

17-1103—*Free the Nipple, et al. v. City of Fort Collins*

**HARTZ**, Circuit Judge, dissenting:

The Supreme Court has been at the forefront of the march for gender equality. But it has never suggested that men and women are identical or that the law cannot recognize their inherent differences. On the contrary, in *United States v. Virginia*, 518 U.S. 515, 533 (1996), it wrote: "'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration . . . ." That pronouncement should, at the least, cause one to pause before expanding Supreme Court equal-protection doctrine that has been applied in wholly different contexts so that it encompasses laws founded on notions of the erotic, particularly when the distinctions in the law are directly based on inherent biological, morphological differences between men and women. The case before us concerns such a law.

Let me begin by stating what I believe to be common ground. A fundamental precept of equal-protection doctrine is that each person should be judged as an individual, not as a member of a group. The law cannot treat the genders differently when there is no relevant difference between them. No reasonable person now believes that men and women differ in their talents and performances as, say, lawyers, so discrimination in licensure cannot be tolerated. But even if there are relevant differences, those differences cannot justify differences in treatment unless there is a very good reason not to use gender-neutral criteria. In particular, gender discrimination cannot be justified simply by significant disparities between the bell curves showing the distribution of a specific talent or capacity or preference within each of the two groups. Even if women are, on average,

substantially weaker than men, that is no reason to automatically disqualify a woman from a job that requires more strength than that possessed by the average woman. If an individual woman can satisfy the strength requirements, it is irrelevant that most women could not. Even if men are, on average, less interested in nurturing than women are, that is no reason to disqualify a man from a nursing position. After a divorce, custody of the children should depend on the specific qualities of the parents, not their genders. In these cases, the equal-protection problem is cured by requiring the use of gender-neutral language—language that focuses on the pertinent criteria rather than stereotypes about a particular gender. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 n.13 (2017) ("Even if stereotypes frozen into legislation have 'statistical support,' our decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn.").

Thus, the Supreme Court has invalidated numerous laws treating males and females differently because the laws violated the Equal Protection Clause of the Fourteenth Amendment (or the equivalent doctrine under the Due Process Clause of the Fifth Amendment). The most recent, *Morales-Santana*, 137 S. Ct. 1678, concerned a statute under which a child born abroad to unmarried parents, one of whom was a United States citizen, could qualify for citizenship if the citizen parent was a mother with *one* year of continuous physical presence in the United States, but required a citizen parent who was the father to have *five* years of continuous presence. *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 726–40 (2003), concerned gender discrimination in family leave. *United States v. Virginia*, 518 U.S. 515 (1996),

invalidated the exclusion of women from the Virginia Military Institute. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), invalidated gender discrimination in using peremptory strikes in jury selection. *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982), invalidated the exclusion of males from the nursing school at the State's sole single-sex university. *Kirchberg v. Feenstra*, 450 U.S. 455 (1981), invalidated a statute that granted only husbands the right to manage and dispose of jointly owned property without the spouse's consent. *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142 (1980), invalidated a statute requiring a widower, but not a widow, to show he was incapacitated from earning a wage in order to recover benefits for a spouse's death under workers' compensation laws. *Orr v. Orr*, 440 U.S. 268 (1979), invalidated a statute providing that only men could be ordered to pay alimony following divorce. *Craig v. Boren*, 429 U.S. 190 (1976), invalidated a statute allowing women to purchase "nonintoxicating" beer at a younger age than could men. *Stanton v. Stanton*, 421 U.S. 7 (1975), invalidated a statute providing that women reached legal majority at an earlier age than did men. *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975), invalidated a statute providing that widows, but not widowers, could collect survivors' benefits under the Social Security Act. *Frontiero v. Richardson*, 411 U.S. 677 (1973), prohibited basing the determination of a spouse's dependency on the gender of the member of the Armed Forces claiming dependency benefits. And *Reed v. Reed*, 404 U.S. 71 (1971), invalidated a statute that preferred men to women as administrators of estates.

In the above decisions the Supreme Court applied (although only implicitly in the earlier cases) "heightened scrutiny," which requires "an exceedingly persuasive

3

justification" for the gender-based treatment. *Morales-Santana*, 137 S. Ct. at 1690 (internal quotation marks omitted). Such scrutiny was appropriate because in each case the underlying rationale for the legal distinction in the treatment of the two genders was part of the long history of "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533; *see J.E.B.*, 511 U.S. at 135–36. The invalidated laws were predicated on stereotypes under which every member of a gender was treated as having a talent, capacity, or preference that most members of the gender have or were perceived as having.

The Fort Collins indecency ordinance (the Ordinance) is not such a law. It is part of a long tradition of laws prohibiting public indecency—the public display of portions of the anatomy that are perceived as particularly erotic or serve an excretory function. These laws may be justified as reducing or preventing antisocial behavior caused by indecent exposure: offensive behavior ranging from assault to corruption of youth to simply distraction from productive activity. The Ordinance does not discriminate against women on the basis of any overbroad generalization about their perceived "talents, capacities, or preferences." To the extent it distinguishes between the sexes, it is based on inherent biological, morphological differences between them. Those differences are not stereotypes. They are not statistical differences, they are not matters of degree. They are differences in anatomical structure that reflect the unique biological roles played by males and females. (Plaintiffs' "evidence" that the breasts of men and women are essentially identical cannot be taken seriously.) We are not dealing here with a "simplistic, outdated assumption that gender could be used as a proxy for other, more

4

germane bases of classification." *Mississippi University for Women*, 458 U.S. at 726 (internal quotation marks omitted).

And, to go back to first principles in equal-protection jurisprudence, there is nothing inherently invidious to an adult of either gender in declaring that an inherent biological, morphological feature of his or her body is erotic. That view would be inconsistent with the fundamental role of sexual attraction in our most revered social institution—marriage; to believe that a spouse is sexually attractive is not to demean the spouse. I do not think the Supreme Court has embraced the view that it is.

In this light, it is apparent that the rationales supporting heightened scrutiny of gender discrimination have no purchase in the context of indecency laws based on inherent biological, morphological differences between the sexes. The proper standard of review is the rational-basis standard generally applied to economic and social regulation. One might argue that any departure from heightened scrutiny poses a danger that the tools for ending gender discrimination will be weakened in future cases. In my view, however, the danger is the contrary. As I shall explain below, attempts to treat the above-described type of regulation under a heightened-scrutiny standard pose a significant risk that the standard will be weakened, thereby endangering the power of equal-protection doctrine to control gender discrimination.

Plaintiffs' arguments against the Ordinance are founded on the contention that it is predicated on a distorted view of the erotic nature of the female breast that has been imposed by an anti-female culture. Although one can debate about how much of our society's view of the female breast is cultural and how much is biological (instinctual),

5

the argument is certainly one that can be presented to a court. But it is not an argument like those in disputes that the Supreme Court has reviewed under heightened scrutiny—equal-protection cases that challenge the notion that males, or females, are not good at certain tasks or worthy of a benefit because of their inherent talents, capacities, or preferences. And resolution of the argument will, at least for the time being and the foreseeable future, depend on unproved theories (by, say, neurologists, evolutionary biologists, psychologists, and sociologists), rather than on everyday observations of what people are doing.

Further, even if notions of the erotic are purely culturally based, it is unclear why that is relevant to the validity of indecency laws. The purpose of those laws is to reduce antisocial behavior. Such laws must deal with the real world. Legislation itself is rational even if the behavior it attempts to control is irrational (such as sexual assault purportedly caused by objectification of the female body). What would be the state of society if legislation could control only rational behavior? A regulation designed to reduce the antisocial effects of irrational thinking does not constitute an endorsement of that irrational thinking. Are laws regulating pornography and obscenity invalid if the societal harms they are intended to prevent are caused by cultural influences rather than purely biological ones? The only assumption about men and women underlying the Ordinance is that because of the erotic potential of female breasts, their public exposure will induce misconduct.

The psychological theory underlying Plaintiffs' concerns is objectification theory. As I understand the theory, its concern is not with loving, respectful relationships in

6

which the female breast has an erotic role. Rather, its concern is that our culture has come to objectify the female body, divorcing it from the human being to which it belongs, and valuing the woman primarily as just a body (or collection of body parts) to be used or consumed by others. In other words, women are treated as sex objects. The media may not be the sole cause, but advertisements and entertainment thrust this culture on the public. The harmful consequences are multiple and severe. The effect on men is that they mistreat women, from engaging in sexual assault to belittling their talents. The effect on women is more insidious. Many internalize the objectification they experience, causing them to obsess about their appearance and to suffer severe damage to their self-image and mental health—with consequences to their educational attainment, jobs, etc. This damage is not caused by the women themselves; they do not wish their bodies to be objectified. Objectification is imposed on them by society. Plaintiffs oppose such objectification and the sources (such as advertisements and entertainment media) that fuel it. They believe that permitting women to publicly bare their breasts will educate the public that the female breast need not be treated as a sexual object and thereby help reduce objectification and the damage it causes. The Ordinance, in their view, promotes objectification by assuming that the female breast is necessarily erotic and therefore compelling it to be covered.

Perhaps the theory is sound and Plaintiffs' approach will improve the treatment of women. But others could believe that a different approach is preferable, even if they endorse objectification theory. Some might think that the purposes of the Ordinance are very much in tune with Plaintiffs' concerns. The purposes expressed in support of the

7

Ordinance can be characterized as preventing just the sort of antisocial conduct that purportedly can arise from "objectifying" the female breast: misconduct by some people caused by their treating the female breast (and the woman) as a sex object and exposure of children to breasts that are treated as sex objects. After all, it appears to be an essential premise of objectification theory that the woman whose body (breast) is objectified is not the one who controls that objectification. It is other people who objectify her body. When Plaintiffs publicly bare their breasts, even in a nonsexual manner with the purpose of conveying that there is nothing necessarily "sexy" about them, they cannot determine how others will view their breasts. Under objectification theory it is the response of others to the female breast, not the woman's personal intent, that drives objectification. Some, perhaps most, may react to Plaintiffs in a way that treats their breasts as sex objects. Indeed, an article co-authored by Plaintiffs' expert, Professor Tomi-Ann Roberts, cited research showing that sexual objectification is most likely in "public, mixed-gender, unstructured" spaces—just where Plaintiffs wish to appear topless. Fredrickson & Roberts, Objectification Theory, 21 Psychology of Women Quarterly 173, 197 (1997).[1] How does it help children grow up well-adjusted to expose them to such exchanges in the public square? *See* Aplt. App. Vol. III at 203–05 (testimony by Professor Roberts, agreeing that "a child having exposure to a sexualized female breast

---

[1] The full text states: "[S]exual objectification is unlikely to affect any woman all the time. The extent to which particular social contexts accentuate a woman's awareness of actual or potential observers' perspectives on her body will, in part, predict the degree and kind of negative repercussions that she may experience. Sociological research has shown that it is in certain spaces—namely public, mixed-gender, unstructured ones—that women's bodies are most subject to evaluative commentary by others."

might be harmful or negative to that child," stating that "the massive exposure to sexualized female breasts that children are made aware of -- that is something that should be controlled," and agreeing that "when this information that children are being exposed to is sexualized, it's bad; but when it's nonsexualized, it's either neutral or good." ). And even if Plaintiffs' public displays have the desired effect, others may take advantage of the opportunity to publicly display their breasts in a manner that promotes objectification without crossing the line into lewdness prohibited by other statutes.

I do not presume to resolve these issues. But I think it fair to say that they do not raise the sorts of questions that lend themselves to review under the heightened scrutiny demanded by Plaintiffs. The "exceedingly persuasive justification" standard is a poor tool, probably an unworkable one, for assessing the propriety, the constitutionality, of public-indecency laws. These laws are justified as promoting public order, quality-of-life, and morality. In evaluating these laws, we therefore must ask whether those purposes are served. The parties, the district court, and the panel majority have all examined whether the Ordinance can be justified on the ground that it prevents societal harms by maintaining public order, promoting traffic safety, and shielding children from psychological harm. These issues have not been relevant in Supreme Court gender-discrimination cases, where the focus of the Court has been on the individual being discriminated against and the question is whether that individual's gender necessarily precludes him or her from having the "talents, capacities, or preferences" required for the benefit. *Virginia*, 518 U.S. at 533.

9

Under heightened scrutiny, a distinction between the genders can be justified only by "exceedingly persuasive" evidence. *Morales-Santana*, 137 S. Ct. at 1690 (internal quotation marks omitted). So how could a government *prove* that an indecency law accomplishes its purpose? We can begin with laws prohibiting total nudity in public. Perhaps they are enacted solely for aesthetic reasons; but I suspect they are also justified as protecting public order, improving the quality of life, and preventing improper influences on the young. Yet it is hard to see how any such law could be upheld if compelling empirical data is required. What does one use as a control group (a society where public nudity is common)—some small isolated community? Legislators, and the public they respond to, must rely on intuitions—intuitions supported by millennia of traditions in our society. One could say that these traditions are merely cultural. But, contrary to some modern thought, that is not necessarily a stigma. One can recognize that our culture has been disgraced by discrimination, particularly racial, religious, and gender discrimination, and still recognize the good that has been provided by other components of that culture. In any event, my point is that this is not a matter that can be proved under the standards of heightened scrutiny.

The difficulty of obtaining probative evidence does not significantly diminish when one considers where to draw the line regarding the minimal amount of clothing required. Should any exposure of the buttocks whatsoever be prohibited? What sort of coverage of the genitalia is required? How much of the female breast can be exposed, and in what context? (For example, nursing in public, which is recognized by the Ordinance as an exception to the general prohibition, may have minimal erotic effect on

10

others because of the context, although the exception might be justified simply because of the strong public interest in permitting nursing.)   There are two particular difficulties. One, again, is the difficulty of finding a control group.  If the issue is whether any harm would flow from eliminating any prohibition on women fully exposing their breasts, we would need an example of where such public exposure is common.  It is not enough to find a place where no law prohibits such exposure if exposure is still rare.[2]  Any effect of rare events is likely to be undetectable in the data.  Another difficulty is measuring long-term effects.  In particular, if there is psychological damage to children, that may not surface for a long time.[3]  And when it does surface, the children may not live in the community that serves as a control group.  *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) ("There are some propositions for which scant empirical evidence can be marshaled, and the harmful effect of broadcast profanity on children is one of them.  One cannot demand a multiyear controlled study, in which some children are

---

[2]  The panel opinion suggests that the apparent infrequency of the most problematic types of public toplessness (downtown or at swimming pools or outside schools) in communities that do not prohibit the practice is a constitutional argument against the Ordinance.  *See* Maj. Op. at 18.  But even if the harm is limited by the infrequency of the practice, I do not see why the city cannot try to prevent even that harm, or why it must await more significant harm before it can prohibit the practice.  The usual criticism of government is it makes no effort to prevent a problem until the problem is advanced.

[3]  It does not appear that Plaintiffs challenge the general proposition that exposing children to nudity or female toplessness can be psychologically damaging.  *See, e.g., Ginsberg v. State of New York*, 390 U.S. 629, 641–43 (1968) (affirming against First Amendment challenge a statute that restricts sale of obscene material to minors that could not be prohibited with respect to adults).  As I understand them, their objection to exposure, however, would be only when the context of the nudity or toplessness promotes objectification.

intentionally exposed to indecent broadcasts (and insulated from all other indecency), and others are shielded from all indecency.")

The testimony of Plaintiffs' expert, Professor Roberts, is relevant here. She acknowledged that "there isn't any data on whether or not allowing female toplessness or not allowing female toplessness impacts the process of self-objectification one way or the other." Aplt. App. Vol. III at 212. The only study she referred to as supporting her views regarding public toplessness was an 18-year longitudinal study of 200 children in California of European-American descent. *See* Paul Okami, Ph.D., et al., *Early Childhood Exposure to Parental Nudity and Scenes of Parental Sexuality ("Primal Scenes"): An 18-Year Longitudinal Study of Outcome, Archives of Sexual Behavior*, Vol. 27, No. 4, 361, 367 (1998). The study indicated various psychological benefits, and no negative effects, on children exposed to *parental nudity* in their early years (and reported positive results for males and mixed results for females from having watched their parents having sex). Professor Roberts said nothing about the study ever having been replicated. But even on its own terms, it would show only the desirability of exposing children to nudity in the home—an environment where objectification can presumably be excluded. (It is interesting that the professor did not argue that the study supports public nudity, as opposed to just toplessness. She volunteered in her testimony that "[g]enitals should be covered," Aplt. App. Vol. III at 218, without explaining how that is consistent with the study.) As I understand the professor's testimony, she thinks that it is harmful to women when the female breast is "objectified" as an object of sexual desire, but not when it is displayed but not objectified. She did not explain, however, how a parent taking a

12

child to a public place can be confident that the exposed breasts of a woman in that place will not be so objectified, either by the woman herself or by the responses of onlookers. It would not be unreasonable to think that the city ordinance actually protects children from witnessing the objectification of the female breast.

To recap the salient reasons why the rationales for heightened scrutiny do not apply here: (1) the breast of the mature female is anatomically different from the male breast; (2) to say that the female breast has erotic potential is not invidious to women and is not a stereotype, certainly not an overbroad generalization about the talents, capacities, or preferences of women; (3) courts cannot determine with any degree of confidence whether erotic potential is biological (instinctual) or cultural, and the issue is of questionable relevance anyway; (4) a law restricting the public display of the mature female breast need not be predicated on the notion that the mature female breast is nothing more than a sex object; and (5) societal harm from public eroticism (including objectification of the female body) often does not readily lend itself to objective proof. This is not to say that the Ordinance is a wise law, or even a rational one, a matter on which future research may be enlightening. I express no view on that. I do believe, however, that in this context, courts must exercise some humility. We should not run with the latest psychological or sociological study and override legislative judgments without the most careful consideration.

I recognize that a number of courts, almost all that have considered the issue, have upheld against equal-protection challenges various indecency laws prohibiting women from exposing their breasts on the ground that they survive heightened scrutiny. *See*

13

Kimberly J. Winbush, J.D., *Regulation of exposure of female, but not male, breasts*, 67 A.L.R. 5th 431 (originally published in 1999) (collecting cases). But I am reluctant to follow that lead. Because of the difficulty of obtaining proof of the effects of indecency, I question whether the evidence supporting the laws provides "an exceedingly persuasive justification" for them. It would be unfortunate if by upholding indecency laws, the courts weaken the scrutiny applied to laws that truly do discriminate against women on the basis of their perceived "talents, capacities, or preferences."

Finally, because the Fort Collins ordinance should be subjected only to rational-basis review, I would reverse the grant of the preliminary injunction and remand for further proceedings. I therefore respectfully dissent.